**DELTA AND PINE LAND COMPANY, Plaintiff-Appellee,**

v.

**PEOPLES GIN COMPANY and Hollandale Seed & Delinting Company, Inc., Defendants-Appellants.**

No. 82–4144.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1983.

imprisonment or custody. . . ." *Pierre v. United States,* 525 F.2d 933 (5th Cir.1976).

Nathan P. Adams, Jr., Greenville, Miss., for Peoples Gin Co.

L. Carl Hagwood, Frank W. Hunger, Greenville, Miss., for Hollandale.

Donald Bourland, Memphis, Tenn., for plaintiff-appellee.

Before CLARK, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

CLARK, Chief Judge:

Delta & Pine Land Company brought this action against Peoples Gin Company and Hollandale Seed & Delinting Company alleging that they had infringed its rights under the Plant Variety Protection Act, 7 U.S.C. § 2321, *et seq.* The district court granted summary judgment in favor of Delta. The single issue on this appeal is a novel one. The question to be determined is whether Peoples and Hollandale are exempt from the operation of the Act pursuant to the "crop exemption," 7 U.S.C. § 2543. We hold that they are not, and affirm the judgment of the district court. 546 F.Supp. 939.

Delta holds a certificate of plant variety protection that gives it the exclusive right to market and reproduce a novel variety of cottonseed known as "Deltapine 41."[1] Peo-

---

1. A "novel variety" of seed exists if there is: (1) Distinctness in the sense that the variety clearly differs by one or more identifiable morphological, physiological or other characteristics (which may include those evidenced by processing or product characteristics, for example, milling and baking characteristics in the case of wheat) as to which a difference in genealogy may contribute evidence, from all prior varieties of public knowledge at the date of determination . . .
(2) Uniformity in the sense that any variations are describable, predictable and commercially acceptable; and
(3) Stability in the sense that the variety, when sexually reproduced or reconstituted, will remain unchanged with regard to its essential and distinctive characteristics with a reasonable degree of reliability commensurate with that of varieties of the same category in which the same breeding method is employed.
7 U.S.C. § 2401.
A "breeder of any novel variety of sexually reproduced plant (other than fungi, bacteria, or first generation hybrids) who has so reproduced the variety, or his successor in interest, shall be entitled to plant variety protection therefor. . . ." 7 U.S.C. § 2402.
A certificate of plant variety protection gives the breeder the right "to exclude others from selling the variety, or offering it for sale, or

ples is a nonprofit agricultural cooperative with approximately fifty farmers as members. It gins the members' cotton, handles their cottonseed, and transacts other agricultural business on a cooperative basis. Hollandale operates a seed delinting[2] and storage plant.

After a member's cotton is ginned, the separated cottonseed is normally sent to an oil mill. Prior to the bringing of this action, there were four situations in which that was not the case. A member who had a good crop would occasionally instruct Peoples to save his seed so that he could plant it the following spring. Or, he might direct Peoples to save the seed for a particular member other than himself. He might direct Peoples to hold the seed for anyone who expressed an interest in buying it. In the fourth situation, a prospective buyer would approach Peoples and request a certain variety of seed. Peoples would then contact potential sellers. No cash ever changed hands. Appropriate debits and credits were entered on the cooperative's books. Peoples itself did not buy or sell any seed.

Once it was determined that a batch of seed was to be saved from the oil mill, Peoples would transport it to Hollandale for delinting. After completing the delinting process, Hollandale placed the seed in labelled storage bags. The labels did not indicate that the seed was a protected variety. When it was time for spring planting, the farmers would either pick up their seed, or Hollandale would deliver it to them.

Peoples received cotton from its members for ginning in the fall of 1981. It followed the procedures outlined above, and saved a considerable amount of Deltapine 41. In the end, some of the members who obtained Deltapine 41 seed were not its original producers.

Delta found out about the practice the following fall. It filed suit against Peoples and Hollandale seeking injunctive relief and damages for unlicensed sales and transfers of Deltapine 41 seed. Delta based its claim on 7 U.S.C. § 2541 which provides in part:

> Except as otherwise provided in this subchapter, it shall be an infringement of the rights of the owner of a novel variety to perform without authority, any of the following acts ...
>
> (1) sell the novel variety, or offer it or expose it for sale, deliver it, ship it, consign it, exchange it, or solicit any offer to buy it, or any other transfer of title or possession of it;
>
> .    .    .    .    .
>
> (6) dispense the novel variety to another, in a form which can be propagated, without notice as to being a protected variety under which it was received; or
>
> .    .    .    .    .
>
> (8) instigate or actively induce performance of any of the foregoing acts.

Peoples and Hollandale did not dispute that Delta was the owner of a novel variety protected under the Act. Rather, they argued that they were exempted from the operation of § 2541 by the "crop exemption," 7 U.S.C. § 2543 which provides in part:

> It shall not infringe any right hereunder for a person to save seed produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a crop for use on his farm, or for sale as provided in this section: *Provided,* That without regard to the provisions of section 2541(3) of this title it shall not infringe any right hereunder for a person, whose primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell such saved seed to other persons so engaged, for reproductive purposes, provided such sale is in compliance with such State laws governing the sale of seed as may be applicable.

---

reproducing it, or importing it, or exporting it, or using it in producing (as distinguished from developing) a hybrid or different variety therefrom...." 7 U.S.C. § 2483.

**2.** Delinting is a treatment that must be applied to the seeds before they can be planted.

After an initial period of discovery, the district court granted summary judgment in favor of Delta. The district court held that § 2543 is limited to transactions in which farmers sell their seed *directly* to other producing farmers without the active assistance of a third party to arrange the sale. In applying this principle, the court concluded that Peoples violated the Act when it actually arranged sales between its members. This occurred when a member authorized Peoples to sell seed to any member who wanted to buy it. It also occurred when a member who wished to buy seed contacted Peoples and not the producing farmer, about the availability of seed. On the other hand, the court held that Peoples' practice of saving a producer's seed for a particular member at the producer's request did not violate the Act because Peoples did not arrange sales of that nature. The court also held that Hollandale was not protected by the crop exemption. Therefore, it violated § 2541(6) by dispensing the seed without notice to purchasers that it was a protected variety.

The district court concluded that an immediate appeal would materially advance the ultimate termination of this litigation, and so stated in writing as required by 28 U.S.C. § 1292(b). On the application of Peoples and Hollandale, we permitted the appeal.

Section 2543 exempts sales made by a person [3] "whose primary farming occupation is the growing of crops for sale for other than reproductive purposes." It is necessary in this case to determine whether, in order for a sale to fall within the crop exemption, it must be made by a farmer directly to another farmer without the intervention of a third party, as the district court held, or whether a third party such as Peoples may arrange such sales.

The overriding duty of this court is to determine and give effect to the intent of Congress. *Abdalla v. C.I.R.,* 647 F.2d 487, 496 (5th Cir.1981); *Alabama ex rel. Graddick v. Tennessee Valley Authority,* 636 F.2d 1061, 1066 (5th Cir.1981), *cert. denied,* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1982). Congress did not make clear how it intended to deal with this question in the language of § 2543. It is therefore necessary to look to the purpose of the Act and its legislative history. *See United States v. Noe,* 634 F.2d 860, 861 (5th Cir.1981), *cert. denied,* 454 U.S. 876, 102 S.Ct. 355, 70 L.Ed.2d 186 (1982); *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1981).

In § 2581, Congress made clear its purpose for enacting the Act.

It is the intent of Congress to provide the indicated protection for new varieties by exercise of any constitutional power needed for that end, so as to afford adequate encouragement for research, and for marketing when appropriate, to yield for the public the benefits of new varieties.

Congress expected the Act to stimulate private plant breeding, thus allowing government agricultural experiment stations to increase their efforts in needed basic research, and permit public expenditures for applied plant breeding to be diverted to important areas which industry would not pursue. Passage of the Act would give farmers and gardeners more choice, make American agricultural products more competitive in world markets, and ultimately result in superior products more resistent to disease and infestation and higher in overall yield and quality. H.Rep.No. 91–1605, 91st Cong., 2d Sess. 3, *reprinted in* 1970 U.S. Code Cong. & Ad.News 5082, 5083. "[M]ajor U.S. crops, like cotton ... now largely ignored by the private researchers, would almost certainly benefit greatly from the impact of a competitive, private plant breeding effort." *Id.* at 5084.

During the course of its enactment some legislators expressed concern that the new law would impose higher costs on the farmer, and ultimately, on the consumer. Section 2543 was added in an attempt to allay these concerns. Although that section ex-

**3.** A "person" is not limited to individuals, but includes partnerships and corporations as well.

empts sales between farmers, Congress recognized that higher seed prices might nevertheless result. In response to a question voicing concern for the farmers, Representative Poage, a congressman instrumental in the passage of the Act, stated:

I do not think there is any doubt that it will mean if somebody produces a seed that gives better results than anybody else's seed, and if he is the only one who can sell that seed, then he will get more for it. . . . This is the only way we know to get people to invest their time and money. It is expensive to develop such seeds. So in the long run we believe there will be beneficial results for the producers and farmers.

116 Cong.Rec. 40,295–40,303, 40,295 (daily ed. Dec. 8, 1970) (statement of Rep. Poage). Thus, contrary to what Peoples and Hollandale argue, the crop exemption was not intended to provide farmers with unlimited insulation from the negative side effects of the Act.

In purpose and operation, the farmer exemption appears to be at odds with the primary purpose of the Act. While the main body of the Act assures developers of novel varieties the exclusive right to sell and reproduce that variety, the crop exemption dilutes that exclusivity by allowing individual farmers to sell the protected variety without liability. The broader the construction given the exemption, the smaller the incentive for breeders to invest the substantial time and effort necessary to develop new strains. The less time and effort that is invested, the smaller the chance of discovering superior agricultural products. If less time and effort is invested, longterm benefits to the farmer in the form of superior crops and higher yields will be lost. Although it may appear that the broadest reading of the exemption would benefit farmers today, it could be detrimental to their interests tomorrow.

■ Thus, the narrower reading of the exemption is more in keeping with Congress' primary objective. Such a reading creates the greatest amount of internal harmony in the overall statutory scheme. *See*

*Zemurray Foundation v. United States,* 687 F.2d 97 at 102 (5th Cir.1982); *Duke v. Univ. of Texas at El Paso,* 663 F.2d 522, 525 (5th Cir.1981). We therefore conclude that Congress did not intend for the crop exemption to cover every sale from one farmer to another.

Because the solution adopted by the district court is a reasonable one, we affirm. It prevents the crop exemption from thwarting the purpose of the Act, while preserving the farmer's right to sell his seed directly to other farmers. The court's reasoning is persuasive:

Absent active participation by a third party, a farmer's awareness of prospective farmer sellers and purchasers is necessarily limited by his own initiative and personal efforts, which serve to reduce the volume of sales that might qualify for exemption. Where a third party, such as a cooperative association, acts as agent, or broker, by bringing farmer buyers and sellers together, however, the volume of such sales is apt to increase according to the aggressiveness and size of the cooperative, often with no limitation upon its growth. To accord exempt status to extensive sales made on behalf of farmers by such entities would frustrate the basic purpose of providing protection to the breeder.

Under this construction, section 2543 only exempts sales of the protected variety from one farmer directly to another farmer accomplished without the active intervention of a third party. An agent or broker may not arrange the deal. There must be a one-on-one relationship between the farmers.

■ This is not to say that the seller farmer must physically deliver the seed to the buyer. A sale is exempt if the seller instructs his cooperative to forward his seed to a particular named buyer. In that situation, the cooperative has not arranged the sale. Nor has it played an active role in the transaction. It has merely served as the vehicle for the transfer of possession. A very different situation would develop if the cooperative is permitted to seek out

potential buyers or sellers, or even to make it known that it holds seed for purchase by unidentified buyers. In those situations, the cooperative has actually arranged the sale. Therefore, the transaction falls outside the coverage of § 2543. The district court correctly ruled that Peoples' practice in arranging sales in this manner was not exempt under § 2543. Therefore, its conduct violated § 2541(1).

For the same reasons, Hollandale may not benefit from the farmer exemption. Because it dispensed the protected variety without notice that it was protected, it violated § 2541(6).

The crop exemption only contemplates direct sales between farmers without the active participation of a third party. Peoples and Hollandale violated the Act. The judgment appealed from is affirmed. The district court must now determine the proper remedy.

Affirmed and Remanded for Further Proceedings.