**DELTA AND PINE LAND COMPANY and Mississippi Agricultural and Forestry Experiment Station, Plaintiffs–Appellants,**

v.

**The SINKERS CORPORATION, Defendant–Appellee.**

No. 98–1296.

United States Court of Appeals, Federal Circuit.

May 14, 1999.

Shawn N. Sullivan, Lake Tindall, LLP, of Jackson, Mississippi, argued for plaintiffs-appellants.

Mark J. Pelts, Pelts, McMullan & Edgington, of Kennett, Missouri, argued for defendant-appellee.

Before MICHEL, CLEVENGER, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Circuit Judge CLEVENGER.

MICHEL, Circuit Judge.

Plaintiffs–Appellants Delta and Pine Land Company ("DPL") and Mississippi Agriculture and Forestry Experiment Station (a unit of the Mississippi State University) ("Mississippi") (collectively, "Delta") appeal from the judgment of the United States District Court for the Eastern District of Missouri dismissing all of Delta's claims against The Sinkers Corporation ("Sinkers"). *See Delta and Pine Land Co. v. The Sinkers Corp.,* No. 93CV77–DJS (E.D.Mo. Mar. 5, 1998). Delta is the owner of numerous Certificates of Plant Variety Protection ("PVP Certificates") issued by the Plant Variety Protection Office of the United States Department of Agriculture, including PVP Certificates for many varieties of cotton[1], several of which are at issue here. Delta brought the instant action in the district court, claiming infringement of Delta's intellectual property rights under the Plant Variety Protection Act ("PVPA"), 7 U.S.C. §§ 2321–2581 (1994). Specifically, Delta presented three claims that Sinkers infringed their rights by: (1) transferring possession of protected seed without Delta's authority; (2) failing to mark bags of protected seed with a notice that they contained protected seed; and (3) funneling large quantities of protected seed through its facilities with knowing indifference to the lack of authority from Delta and the absence of an exemption, thereby actively·inducing infringing acts by others. Following a bench trial, the district court found no infringement and dismissed all three of Delta's claims on March 5, 1998.

The appeal was submitted for our decision following oral argument on February 2, 1999. We affirm the district court's dismissal of Delta's active inducement claim; we vacate the district court's dismissal of Delta's unauthorized transfer of possession and failure of notice claims as based on the application of incorrect legal tests concerning implied exemptions under the PVPA; and we remand Delta's transfer of possession and notice claims to the district court for superseding fact-finding under the correct construction of the disputed terms of the relevant subsections of the statute as set forth herein, or such further proceedings as it deems necessary, consistent with our opinion.

## BACKGROUND

DPL is a developer and breeder of cotton planting seed. It holds numerous PVP Certificates protecting its novel seed varieties. DPL sells these protected cottonseed varieties through approved distributors. The authorized distributors sell seed to growers who plant the seed, harvest the cotton, and then dispose of all excess protected cottonseed.

Mississippi is engaged in developing, breeding and processing cotton planting seed for the production of commercial crops. Mississippi owns a PVP Certificate for a cotton variety known as DES–119, and has granted DPL an exclusive license for the sale and distribution of this seed. Pursuant to this agreement, DPL distributes DES–119 cottonseed to farmers through its approved distributors.

Sinkers is headquartered in Kennett, Missouri. Its principal business activity consists of delinting and conditioning cottonseed for use as planting seed. Cotton growers bring undelinted cottonseed to Sinkers, Sinkers delints the cottonseed per their request, and then turns the cotton-

---

**1.** These cotton varieties include Deltapine 50, Deltapine 51 and Deltapine 5415, which are commonly referred to in the industry as DPL-xx, *e.g.,* DPL–5415.

seed over to whomever the grower specifies. The delinting process is an essential step in preparing cottonseed for planting. Virtually all cotton farmers in the United States utilize delinted cottonseed in planting their crops.

To process cottonseed, such as a farmer might purchase from Delta, the seed is first taken to a gin where most of the fiber or lint is separated from the seed. The seed can then be taken to a delinter, such as Sinkers. The delinting process removes the remaining lint. Undelinted, but ginned, cottonseed arrives at Sinkers's Kennett facility in a truck. In some cases, individual farmers bring cottonseed to the facility in pickup trucks. In other cases, however, large quantities of cottonseed, from many different distributors, farmers and farming cooperatives, arrive in tractor-trailer rigs. Upon its arrival at Sinkers's facility, undelinted cottonseed is placed in a "run bin". The seed is then fed into an auger, where it is wetted with a sulfuric acid solution. From there, the seed passes through a centrifuge where the solution is spun off. The seed emerges in a damp-dry condition and is passed through two dryers and two buffers. In the drying and buffing process, all remaining lint is separated from the seed. After culls, sticks and debris are removed from the bulk seed, the seed is treated with chemicals (if the client so requests—this is the "conditioning" stage of the process, the seed having by now been delinted), and then placed in fifty-pound bags.[2] After the seed has been bagged, it is loaded onto trucks and transported to its next destination, which may or may not be the place from which the seed was sent, depending on the instructions given to the delinter.

Delta develops new varieties of seed by pollinating one unique variety with another. A new variety sought to be reproduced for sale by DPL is turned over to DPL's foundation seed department, which increases the volume through repeated replanting while protecting the genetic purity of the variety, to reach saleable quantities of seed. Thereafter, to increase the amount of seed they have to sell, DPL hires farmers as contract growers who will return to DPL the progeny of their crop. These seed varieties are protected by the PVPA, which "protects owners of novel seed varieties against unauthorized sales of their seed for replanting purposes." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 181, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995).

In 1992, Delta obtained information which led them to believe that cottonseed of their PVPA-protected varieties was being delinted at Sinkers's delinting facility in Kennett, Missouri, and was being sold in violation of Delta's rights under the PVPA. In essence, Delta believed that suspected sales by Sinkers, which were certainly unauthorized by Delta, did not fall within any of the statutory exemptions to the PVPA. After further investigation, Delta filed their complaint on April 29, 1993, alleging violations of the PVPA, 7 U.S.C. §§ 2321–2581, and requesting money damages and injunctive relief. Specifically, Delta alleged that by transferring possession of the protected seed with neither authority from Delta nor an exemption under the PVPA, Sinkers violated 7 U.S.C. § 2541(1). Delta further alleged that Sinkers infringed Delta's rights under 7 U.S.C. § 2541(6) by failing to mark the bags of delinted seeds that it shipped to farmers with a notice that the seed being sold or transferred was a protected variety. Finally, Delta asserted that massive quantities of Delta's protected varieties were funneled through Sinkers with its actual knowledge, or at least with knowing or reckless indifference on Sinkers's part regarding the absence of authorization or exemption, thereby actively inducing others to in-

---

**2.** This seed is typically referred to as "brown bag seed".

fringe Delta's PVPA rights in contravention of 7 U.S.C. § 2541(8). The district court found, at the conclusion of a bench trial, that Delta had failed to prove by a preponderance of the evidence that Sinkers committed any violations of Delta's PVPA rights. In essence, the court found that as a passive conduit of seed which it transferred according to the instructions of its customer, Sinkers had no liability under the PVPA, as construed by the district court. All injunctive relief and damages were, therefore, denied.

This timely appeal followed. We have exclusive subject matter jurisdiction under 28 U.S.C. §§ 1292(a)(1), (c)(1) (1994).

## DISCUSSION

The relevant subsections of the PVPA provide as follows:

> [I]t shall be an infringement of the rights of the owner of a novel variety to perform *without authority,* any of the following acts in the United States, or in commerce which can be regulated by Congress or affecting such . commerce, prior to expiration of the right to plant variety protection but after either the issue of the certificate or the distribution of a novel plant variety with the notice under section 2567 of this title:
>
> (1) sell the novel variety, or offer it or expose it for sale, *deliver it, ship it,* consign it, exchange it, or solicit an offer to buy it, or *any other transfer of* title or *possession* of it; . . .
>
> (6) *dispense* the novel variety to another, in a form which can be propagated, *without notice* as to being a protected variety *under which it was received;* or . . .

(8) instigate or *actively induce* performance of any of the foregoing acts.

7 U.S.C. § 2541 (emphasis added). As can be seen from the above language, the PVPA gives the holder of a PVP Certificate rather broad exclusive rights. However, at the time this case was brought in the district court, there was one express, broad exemption to these exclusive rights.[3] The PVPA allowed a farmer to save seed and to use such "saved seed" to produce crops on his own farm, and furthermore allowed certain "farmer-to-farmer" sales of excess saved seed. This exemption was contained in 7 U.S.C. § 2543, which provided as follows:

> Except to the extent that such action may constitute an infringement under [§§ 2541(3) and (4) ], it shall not infringe any right hereunder for a person to save seed produced by him from seed obtained . . . by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a , crop for use on his farm, or for sale as provided in this section: Provided, that without regard to [§ 2541(3) ] it shall not infringe any right hereunder for a person, whose primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell such saved seed to other persons so engaged, for reproductive purposes.

The Supreme Court later interpreted this exemption to mean that, for a farmer to meet the requirements of the above proviso, the farmer may sell for reproductive purposes only so much seed as he has saved for the purpose of replanting his own acreage. See *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 192, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995). Presumably,

---

**3.** This exemption is no longer part of the PVPA. The pertinent language was deleted from the statute in 1994 greatly narrowing this sole express exemption. The amendments deleting certain language, however, apply only to PVP Certificates issued after April 4, 1995, that were not pending on or before that date. *See* Pub.L. No. 103–349, §§ 14(a), 15, 108 Stat. 3144, 3145 (1994). Thus, the original exemption applies to this case, for all asserted certificates were issued before April 4, 1995.

such sales occur only when the farmer reduces or eliminates his cotton acreage, and, thus, has "saved seed" for which he or she has no farming use. Otherwise, there has been little case law interpreting the PVPA. But the language of the statute is clear: the only express exemption to a PVP Certificate holder's rights is that included in section 2543 for farmer-to-farmer transfers of protected seed. In the instant case, however, the district court implied an additional exemption to the rights of a PVP Certificate holder. We must decide if the court was correct in its discernment and its definition of this exemption.

We address, in turn, each of Delta's claims of infringement by Sinkers. We will first review the district court's dismissal of Delta's claim that Sinkers infringed their PVPA rights by making nonexempt transfers of possession of protected seed without their authority. We will then review the district court's dismissal of Delta's claim that Sinkers actively induced infringement of their PVPA rights by funneling large quantities of protected seed through their facilities and on to others with willful indifference to Delta's rights. We will finally review the district court's dismissal of Delta's claim that Sinkers infringed their PVPA rights by failing to mark bags of protected seed as such.

## I. Transfer of Possession Without Authority: 7 U.S.C. § 2541(1)

■ Delta alleges that Sinkers infringed their rights under 7 U.S.C. § 2541(1) "merely by virtue of its transfer of possession of seed without the benefit of an exemption from PVPA liability." Pl.-Appellant's Br. at 4. Sinkers's defense rested on an extension of the express exemption for the farmer-to-farmer sales that it viewed as implied in the PVPA, as previously interpreted. Sinkers argued that it was a mere passive third-party to the lawful transfers of possession incident to sales arranged between farmers under the ex-

press exemption and therefore could not itself be liable. Until *Asgrow,* the leading case on the farmer-to-farmer exemption was *Delta and Pine Land Co. v. Peoples Gin Co.,* 694 F.2d 1012 (5th Cir.1983) (*"Peoples"*). It remains the only other significant precedent on implied exemptions under the PVPA.

In *Peoples,* the sole issue was whether the involvement of a third party broker rendered otherwise exempt sales between farmers ineligible for the exemption. The Fifth Circuit held that 7 U.S.C. § 2543 "only exempts sales of the protected variety from one farmer directly to another farmer accomplished *without the active intervention of a third party."* *Id.* at 1016 (emphasis added). That case concerned the infringement liability of a farmer's cooperative which was brokering exchanges of seed between its members. The fact that the farmer's cooperative, Peoples Gin Company, also ran a gin was not an issue in that case, as the whole focus was on the cooperative's brokering activities. In the instant case, however, the district court made a fact-finding that Sinkers did not broker or actively intervene to arrange the sales that led to the transfers of possession challenged by Delta. *See Delta and Pine Land Co.,* slip op. at 19. We must agree with that fact-finding because on this record it cannot be seen as clearly erroneous. Indeed, it is essentially undisputed. Therefore, we see this case as entirely distinguishable on its facts from *Peoples. See Peoples,* 694 F.2d at 1012. The issue raised in this case, then, is one of first impression. It is whether a passive third-party to a sales transaction, such as a ginner or a delinter, can be held liable for infringement under 7 U.S.C. § 2541(1), as a participant in unauthorized possession transfers, if they fall outside the farmer-to-farmer exemption.

The district court, in resolving this issue, relied on *Peoples* and in particular the language "active intervention" used by the

Fifth Circuit to distinguish between exempt and non-exempt farmer-to-farmer sales. *Peoples* focused solely on sales—selling the protected seed, offering it for sale or soliciting an offer to buy it, and did not reach the transfer of possession clause at issue in the instant case. The district court acknowledged this distinction, but still decided that as this was a subsection (1) case, if the Fifth Circuit had drawn a distinction with regards to selling and buying seed, then that distinction could be drawn with regards to the transfer of possession clause. Accordingly, the district court applied an active/passive (or broker/non-broker) distinction to the subsection (1) transfer of possession claim in the instant case, even though Sinkers was obviously not a broker, holding that:

> the passive conduct of [Sinkers] on the facts here [does] not ... constitute a delivery, shipment or transfer of possession of seed by [Sinkers] within the meaning of § 2541(1), regardless of whether the seed involved is protected or the underlying sale or *transfer involving [Sinkers's] customer is within the § 2543 exemption.*

*Delta and Pine Land Co.,* slip op. at 20 (emphasis added).

Today we hold that the district court's interpretation of 7 U.S.C. § 2541(1) is erroneous as it neither comports with the plain meaning of subsection (1) ("*any* other [unauthorized] transfer of ... possession" of seed varieties for which someone holds certificates (emphasis added)), nor the evident intent of Congress as seen in the statute as a whole.

Significantly, although the word "active" appears in 7 U.S.C. § 2541(8), it does not appear in 7 U.S.C. § 2541(1). Because the plain language of subsection (1) itself does not require the transfer act to be an "active" one, i.e., by a broker, the subsection necessarily appears to comprehend a situation where infringement by transfer of possession could occur without the delinter or a third party brokering a sale, or deciding to whom to transfer possession, but rather was nonetheless transferring possession without authorization from the PVP Certificate holder. Applying the exemption more broadly to grant blanket immunity to a delinter conflicts with the provision providing for liability for any transfer of possession of protected seed.

■ There is, to be sure, a statement in *Peoples* that:

> A sale is exempt if the seller instructs his cooperative to forward his seed to a particular named buyer. In that situation, the cooperative has not arranged the sale. Nor has it played an active role in the transaction. It has merely served as the vehicle for the transfer of possession.

*Peoples,* 694 F.2d at 1017. We agree with the district court that such a factual scenario was not present and hence not at issue in *Peoples* and consequently this statement is dictum.[4] As the Supreme Court has noted there is a "need to distinguish an opinion's holding from its dicta." *United States Nat'l Bank of Ore. v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 463, n. 11, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). Furthermore, *Peoples* addressed only those clauses in subsection (1) that state that selling the protected seed, offering it for sale, or soliciting an offer to buy it, constitutes infringement of the PVPA. *Peoples* did not reach the clause in subsection (1) that states that

---

4. The district court wrote:
In *Peoples Gin,* the sole issue was whether the involvement of a third-party broker rendered an otherwise exempt sale ineligible for the exemption.... *Peoples Gin* does

not address the issue presented here, namely whether a third-party gin or delinter which is *not* a broker of a non-exempt sale is itself guilty of violation of the act.
*See Delta,* slip op. at 18–19

"any other transfer of possession" of the protected seed is infringement, because the court did not have to. In *Peoples*, the parties involved were actually selling and soliciting offers to buy the protected seed, and thus, *Peoples* is legally distinguishable from this case where the legal issue is transfer of possession of protected seed. This language, and hence *Peoples*, cannot, therefore, control our disposition, even though we consider this persuasive authority entirely convincing in its holding, which is limited to the scenario where a defendant goes out and seeks buyers and sellers for protected seed. It could not be binding precedent, however, even if factually and legally applicable, because we have exclusive jurisdiction over all PVPA cases as of shortly after this 1983 decision. *See* 28 U.S.C. § 1295(a)(8) (1994). We must determine all substantive law issues for ourselves, even though on issues of procedural law in such cases, we must defer to the regional circuit, with certain exceptions. See *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1188 n. 2, 37 USPQ2d 1685, 1686 n. 2 (Fed.Cir.1996) ("On procedural matters not unique to the areas that are exclusively assigned to the Federal Circuit, the law of the regional circuit shall be applied.") (citing *Lummus Indus. v. D.M. & E. Corp.*, 862 F.2d 267, 8 USPQ2d 1983 (Fed.Cir.1988)).

More importantly, we do not believe the adaptation of *Peoples* to this case by the district court was consistent with the structure and purpose of the prohibition on unauthorized and non-exempt transfers of possession in subsection (1). The district court is, in effect, adding limiting language ("actively") to subsection (1) that was left out by Congress in subsection (1) and used

by Congress only in subsection (8). The purpose of the PVPA was to "afford adequate encouragement for research, and for marketing when appropriate, to yield for the public the benefits of new varieties." 7 U.S.C. § 2581 (1988). Congress laid out many ways to infringe the rights of an owner of a certificate for a novel variety in 7 U.S.C. § 2541, including to "deliver", or "ship", or make "any ... transfer of title or possession of it," and to "instigate or actively induce performance of ... the foregoing acts." The district court found that Sinkers did not induce anyone to take possession of or sell the seed. The district court also found that Sinkers did not transfer title to the seed. However, Sinkers undeniably transferred possession [5] of the seed, when it delivered the seed to whomever its customer requested delivery be made. Sinkers was given control over the undelinted seed by the farmer or cooperative that delivered the seed to Sinkers, and then Sinkers transferred control of the delinted seed to the farmer or cooperative identified as the recipient by Sinkers's customer. For these reasons, we hold there is no requirement associated with subsection (1) of active intervention or brokering, as there is with subsection (8). The district court therefore applied the wrong legal test and accordingly its dismissal of Delta's claims under 7 U.S.C. § 2541(1) was error. The dismissal is therefore vacated.

On the other hand, the broadest possible reading of subsection (1) does not make much sense to us, either. As a matter of common sense, there must be some limitation inherent in its applicability, despite the scant legislative history which says only: "The following acts performed with-

---

5.  Black's Law Dictionary 1163 (6th ed.1990) defines "possession" as follows:

    Possession. Having control over a thing with the intent to have and to exercise such control. *Oswald v. Weigel*, 219 Kan. 616, 549 P.2d 568, 569. The detention and control, or the manual or ideal custody, of

anything which may be the subject of property, for one's use and enjoyment, either as owner or as the proprietor of a qualified right in it, and either held personally or by another who exercises it in one's place and name.

out authority of the owner of the variety constitute infringement: (1) *Any* transfer of title or possession." H.R.Rep. No. 91–1605 at 1 (1970), reprinted in 1970 U.S.C.C.A.N. 5082; S.Rep. No. 91–1138 at 1 (1970) (emphasis added).

We cannot imagine that Congress would have meant to make a completely innocent third-party liable for infringement because it transferred possession of seed to a farmer at the request of another farmer, its customer. An example of when Congress could not have meant to impose liability might be where a single farmer, Joan, brings in one truckload of seed to be delinted, and Farmer Bob picks the seed up in a transfer of possession that is illegal, because, unbeknownst to the delinter, Joan does not actually farm cotton. Thus, while the transaction appears to fall within the exemption for farmer-to-farmer transfer, actually it does not. The delinter, we think, should be liable for all illegal transfers of possession, when not brokered by them, only if it has scienter. That is, when transferring possession of protected seed under instructions from its customer, the delinter is liable only if it knows the transfer is not within the exemption for farmer-to-farmer transfers. Absent scienter, however, involvement in farmer-to-farmer transfers outside the express exemption, should not subject delinters and ginners to liability for infringement.

The dissent disagrees with this test, arguing, in effect, that delinters and ginners should not be liable for infringement, even with scienter, as long as they did not broker the transfer of possession of the seed. We do not believe that Congress meant for delinters and ginners to be exempt from infringement of the PVPA, even when they are following the instructions of their customers, if they know they are participating in an illegal activity. An example of a scenario highlighting this difference between the dissent's view and our own might be one in which Farmer Joan brings in her seed to be delinted, and signs a contract for two points of delivery. Farmer Joan has had a bumper harvest of protected cottonseed this year, in our example, and Farmer Bob has had a terrible year. Farmer Joan agrees to sell her excess protected seed to Farmer Bob, so that he doesn't have to pay the higher prices charged by the PVP Certificate holder for the protected seed. Farmer Joan tells the delinter that she would like half of her seed delinted and returned to her so that she can replant the same acreage that she had the year before (e.g., the "saved seed" allowed under *Asgrow* ). Farmer Joan then tells the delinter that she would like the other half of her protected seed delinted and delivered to Farmer Bob to use for reproductive purposes on his farm. The delinter at this point clearly has scienter, and knows that Farmer Joan, at least, is participating in an unlawful activity. We cannot believe that Congress did not mean for the delinter to be found liable for infringing the PVPA in this scenario, but that is the result the dissent's test would cause. According to their "brokerage test", the delinter has done nothing wrong here. We feel that if Congress meant the delinters and ginners to be able to follow unquestioningly their customer's orders and still avoid liability, surely they would have written an express per se exemption into the PVPA, just as they did for common carriers.[6]

· We note that this is not the first time we have held that a reasonable reading of a statute inherently requires a limitation of

---

6. The common carrier exemption reads as follows:

> Transportation or delivery by a carrier in the ordinary course of its business as a carrier, or advertising by a person in the advertising business in the ordinary course of that business, shall not constitute an infringement of the protection provided under this chapter.

7 U.S.C. § 2545 (1994).

scienter, even though one is not expressly set forth therein. In *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.1988), we wrote that "[a]lthough [35 U.S.C.] section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement." In a later case, we stated that "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990) (citing *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468–69, 15 USPQ2d 1525, 1528–29 (Fed.Cir.1990)). We acknowledge that in the instant case we are not guided by the legislative history, or by previous case law. However, we agree that by analogy to *Manville* Delta must show not only that Sinkers transferred possession of protected seed without authority, but that Sinkers knew or should have known that their actions were in violation of Delta's PVPA rights, because the transfer could only be reasonably understood to fall outside the exemption for farmer-to-farmer transfers of saved seed that the selling farmer could not use after all in replanting his cotton crop.

We therefore hold that the correct reading of subsection (1) requires that a delinter, ginner, or other third-party transferor facilitating a farmer-to-farmer sale know (knowledge is presumed in a scenario where the third party brokers the transaction) or should reasonably know that its unauthorized transfer of possession is an infringing transaction, i.e., that the sale is not exempt under section 2543. Liability for infringement under subsection (1) thus turns on knowledge. If Sinkers knew, or should have known, that the transfer of possession was not within the farmer-to-farmer exemption, then it can be held liable for infringing subsection (1), but only then.

■ We note that the district court also erred in stating that "the passive conduct of [Sinkers] on the facts here [does] not ... constitute [infringement] ... *regardless of whether the seed involved is within the § 2543 exemption.*" *Delta and Pine Land Co.*, slip op. at 20 (emphasis added). Under *Asgrow* a farmer is allowed to save seed to replant his or her own acreage the next year. In order to plant the seed it must be delinted. Therefore, *Asgrow* must also carve an exemption out for the transfer of possession of protected seed to a delinter if it is only the seed the farmer is saving for his or her own acreage. Whether the seed involved is within the section 2543 exemption thus becomes a crucial and important question.

■ We vacate the district court's decision and remand for a reconsideration of the claim of infringement by the unauthorized transfer of possession under the correct legal test as described above. It may make a difference in result as illustrated by at least one sale of record, as discussed below. Therefore, it cannot be deemed harmless error.

The district court found that Nodena, a family cooperative of several corporations and individuals that conducted farming operations in Mississippi County, Arkansas, was a large customer of Sinkers and had its cottonseed delinted by Sinkers. The district court furthermore found that in calendar year 1993, Nodena sold to other farmers over 122 tons of cottonseed for planting ("reproductive") purposes that Sinkers had delinted.[7] A further fact-finding was that at least some of this seed was

---

7. This is enough seed to plant close to 25,000 acres or forty square miles of cotton. For comparisons sake only, in Mississippi County, Arkansas, the average size of a cotton farm is

approximately 526 acres (there are 181,400 acres of cotton and 345 cotton farms in Mississippi County, which gives an average of 525.8 acres of cotton per cotton farm), or less

referenced in Sinkers's germination logs as "Lot 5" seed, reflecting Nodena's practice of designating seed in that manner to indicate that the seed was DPL–50 seed, a variety of seed protected under Delta's PVP Certificates. The district court's only finding regarding Sinkers's exact role in these transactions was that "the considerable evidence involving sales by Nodena Planting Company to other farmers does not suggest that defendant played any role in *arranging* those *sales.*" *Delta,* slip op. at 18 (emphasis added). The district court did not address what Sinkers's knowledge was of the legality of its transfer of possession according to Nodena's directions. It seems clear, for instance, when Nodena brought in 122 tons of undelinted seed in 1993, although only three years earlier Nodena had brought in just fifty-seven tons, that it would be highly unusual for all of that seed to be seed saved by Nodena to replant its own members' fields. On the other hand, if Sinkers knew that Nodena, a farming cooperative, had greatly increased its total cotton acreage, for example, as a result of signing up additional farmers, then the opposite inference might be warranted. In this scenario, if the district court were to find that Sinkers knew or should have known it was involved in nonexempt farmer-to-farmer transactions, it must be held liable for infringing 7 U.S.C. § 2541(1). This would be so, even if Sinkers was not expressly informed by Nodena that the 122 tons of seed was more than the amount of seed Nodena was allowed to save from year to year, because it would be reasonable and necessary to infer such knowledge. This is true, even if the seed were returned to Nodena by Sinkers, because the amount, if Nodena had not greatly increased its total acreage, greatly exceeds the amount of seed that Nodena is allowed to save under the exemption as construed in *Asgrow.*

We note that the scenario where the seed is returned to the farmer or cooperative from which the seed was received potentially complicates application of the "should have known" standard, as a farmer is entitled to save seed for reproductive use on his own farm, and may in fact save seed for several years of future plantings. However, there are still "red flags" which a delinter such as Sinkers can spot. If a farmer returns year after year with more seed than he or she could possibly use, based either on Sinkers's knowledge of the actual size of the farmer's acreage or, as in the Nodena example, simply an absurdly large amount of seed, then clearly this seed is not being saved for reproductive purposes just for the farmer's own acreage, and Sinkers would have scienter. Under the correct test, the outcome at least as to the Nodena seed could well be different, although we, of course, do not so decide here.[8]

We note that the dissent expresses concern over the "paper trail" that it speculates this test will create. First of all, the certificate holder is required to prove that the ginners and/or delinters knew or should have known they were processing "hot seed." Thus, there is no burden on the ginner or delinter to disprove any-

---

than one square mile. *See Agriculture Census for Mississippi County, Arkansas,* (visited February 12, 1999) <http://govinfo.library.orst.edu/cgi–bin/ag–list?01–093.arc>.

We also note the district court fact finding that in the period 1990 through 1992, Nodena planted only approximately 3500 to 4500 acres in cotton. *See Delta,* slip op. at 10. Furthermore, upon being asked to "identify any farmer, farming entity, group of entities, farm operation or any other noun you want to put to it, that farms 15,000 acres of cotton or

anywhere near it" who delinted with Sinkers, the Sinkers's witness said there were none, that there are some that had five, seven or ten thousand acres in their planting groups, but no more than that. J.A. at 451.

8. We note, furthermore, that as to at least one of the examples, there was a finding that the seed was not proven to be protected, so we presume that that seed would be excluded from further fact-findings on remand.

thing. Accordingly, in many situations no record keeping would be needed.

■ Presumably the ginners and delinters process seed full-time. This would suggest that they work with the same farmers from year to year, and have some idea of how much seed is a reasonable amount of saved seed for a particular farmer, or farming cooperative lawfully to bring in for processing. It should be obvious, for example, that enough seed to re-plant forty square miles of cotton fields is not a reasonable amount for a cooperative to bring in as saved seed for processing. In such a case, but only then, the ginner or delinter may indeed want to ask for written reassurance that it will not be breaking the law by processing this huge quantity of seed, because processing inevitably requires transferring possession of the seed, once delinted or ginned, to someone. However, this written assurance does not impart immunity. If the certificate holder can prove actual knowledge, or show that the delinter or ginner should have known it was handling hot seed, the delinter or ginner is still liable for infringement of the PVPA. We note, furthermore, that while, of course, on this record we could not describe the contents of a standard contract between a farmer or cooperative and a delinter or ginner, it is reasonable to assume that it would address: the price per pound for the processing; the delivery terms; and the condition the farmer can expect the seed to be in when it is returned or re-delivered by the ginner and/or delinter. This contract may also

specify the chemical conditioning treatments the farmer or cooperative wants the seed exposed to ("So . . . they tell you . . . whether they want [the seed] double treated or triple treated" J.A. at 306); the amount of cleaning the seed should be given ("we have . . . some farmers that like to have the seed . . . cleaned a little heavy [,t]ake a little more waste out to give you a better seed" J.A. at 307); it may give the farmer a warranty that his seed will not be mixed with colored cottonseed[9], that his seed will not be mixed with non-USDA approved seed[10], and that he will receive the same variety of seed back that he dropped off to be processed. We do not believe, with this many other specifications which may be present in a contract for cottonseed processing, that it is placing a significant burden on the delinters or ginners to place one more paragraph in the contract, thus providing some limited protection against liability. Accordingly, our test hardly "creates" a complex record-keeping regime. One apparently already exists.

We vacate the district court's holding, based on the wrong legal test of requiring brokerage or other "active intervention" in arranging sales and related transfers of possession, and remand this case to the district court for reassessment of. the facts in light of the correct legal test of knowledge, as set forth herein. Whether additional evidence is needed, we, of course, leave to the discretion of the district court.

### II. Active Inducement by Brokerage: 7 U.S.C. § 2541(8)

■ Delta next alleged that by willfully ignoring the large quantities of apparently

9. We understand that in this day of high technology farming, if colored cottonseed, which has been banned in some cotton growing areas, is mixed, by poor processing at the delinter and/or ginner, when the high speed cotton pickers and balers go through the cotton fields, they cannot stop and remove the colored cotton which therefore can render impure the white cotton the farmer hopes to sell, and lower the price per bale the farmer can receive. The farmer does not know that his seed has been so intermingled until the har-

vest next year. There is presumably some legal action the farmer can file against the delinter and/or ginner for breach of this warranty, which arises from this all-important contract.

10. Every invoice provided to this court in the Joint Appendix contains a stamp stating that the seed is USDA approved seed. *See* J.A. at 173–188.

protected seed that Sinkers was processing without its authority, Sinkers actively induced unlawful transfers of possession by others, and thus infringed Delta's rights under 7 U.S.C. § 2541(8). The district court found, as stated above, that Sinkers did not intervene as a third-party in the transfers of possession of the protected seed. We agree, for it was not clear error for the district court to find that Sinkers did not broker protected seed transfers and did not actively induce anyone to transfer possession of the seed to other parties in any way violative of the statute. Sinkers merely turned delinted seed over to whomever its customers, such as Nodena, identified. In subsection (8) of section 2541, the critical words "instigate or actively induce", clearly evince congressional intent to limit liability under this subsection to those such as brokers, who perform such functions when they arrange transfers of seed, in the instant case via the delinter, between independent sellers and buyers. The district court correctly found, however, that Sinkers did not perform either of these functions. Certainly, its findings are not clearly erroneous. Indeed, the facts seem undisputed. Delta argues here only that Sinkers recklessly or with willful indifference transferred possession of large quantities of protected seed in violation of the PVPA. This might be true, but we make no decision on that issue here, because, even if the allegation is true, it is insufficient to trigger 7 U.S.C. § 2541(8). Sinkers did not broker the sale or transfer of possession of any protected seed, or otherwise instigate or actively induce others to infringe. We therefore affirm the district court's dismissal of Delta's claim against Sinkers for actively inducing infringement of Delta's PVPA rights under 7 U.S.C. § 2541(8).

### III. The Notice Requirement: 7 U.S.C. § 2541(6)

█  Finally, we address the issue of the notice required under subsection (6) of 7 U.S.C. § 2541. The district court only summarily addressed this issue, holding that "the Court would read the 'under which it was received' clause of § 2541(6) to limit the notice requirement to instances in which the seed was *received with a label* stating that it was a protected variety." *Delta*, slip op. at 23 (emphasis added). We vacate the judgment based on this holding by the district court. The proper test is not whether a physical label is somehow attached to the seed when the seed is received, but rather whether through that *or other means* the one in receipt, here Sinkers, knew, or should have known that the seed is a protected variety. Subsection (6) provides that it is infringement to "dispense the novel variety to another ... without notice as to being a protected variety under which it was received." The notice that must be received is not restricted to actual notice, or to notice in the form of labels on the seed, as the district court concluded, or else Congress would surely have included language indicating such restrictions.[11]

By comparison, a patentee seeking to give notice to the public that an item is patented is required by Congress to mark it according to a specific list of acceptable

---

11. We note that this notice requirement is in accordance with at least some state laws. For instance in Mississippi the notice requirement is detailed below.

Each container of agricultural, vegetable, flower, or tree and shrub seeds sold, offered for sale, or exposed for sale, or transported within this state for seeding purposes shall bear thereon or have attached thereto in a conspicuous place a plainly written or printed label or tag in the English language, giving the following information:
I. For agricultural seeds.
(a)The commonly accepted name of kind and variety of each agricultural seed present in excess of five per cent (5%) of the whole and the percentage by weight of each in the order of its predominance.
Miss.Code Ann. § 69-3-5 (1991).

methods as detailed in 35 U.S.C. § 287. The language here is much broader, and merely reads that dispensing of the novel variety without notice that it is a novel variety infringes the rights of the holder of the PVP Certificate covering the novel variety. Because Congress gave specific notice requirements in 35 U.S.C. § 287, and omitted these requirements in subsection (6), we read the latter statute not to require express notice, or labels on receipt, in order for a failure to give notice to infringe.

■ Once again, if we look at the Nodena example discussed above, we can see why this case must be remanded for application of the correct legal test to the facts, which might result in a potentially different outcome. In the Nodena example, the district court found that references in Sinkers's own germination logs to this seed as "Lot 5" seed reflected Nodena's own designation of the seed in that manner to indicate that the seed was DPL–50 seed. See *Delta and Pine Land Co.*, slip op. at 11. Under the test applied by the district court, because this seed arrived with no physical tag on it to indicate that it was protected DPL–50 seed, Sinkers had no responsibility to notify its transferee that the transferred seed was protected seed. However, Sinkers was informed by Nodena that it was Lot 5 seed, according to the notations in its own logs. If on remand the district court finds that Sinkers had notice, i.e., that it knew the term "Lot 5" was Nodena's way of designating protected DPL–50 seed, then Sinkers infringed Delta's PVPA rights when it did not label the bags containing Nodena's delinted seed as protected seed. We further understand that in order to protect the vigor and germination ability of the cottonseed, the delinter and ginner need to know the type of seed they are processing so that they know how to process it, e.g., the proper storage method, the amount of moisture to expose it to, and the temperature least likely to cause it to germinate early. Early maturation seed that has undergone no chemical treatments by the manufacturer, is processed differently from late maturation seed that may have been genetically altered to not be affected by herbicides. It is, therefore, likely that they are accurately informed by the cooperative and farmers of the varieties of seed being delivered for processing and that they may want to take affirmative steps, e.g., germination tests, to assure themselves of the exact varieties accepted for processing, lest they become liable for harming the seed. Once a ginner or delinter has determined the variety of cottonseed undergoing processing, it has an affirmative duty to label the cottonseed with the variety upon returning or re-delivering the cottonseed.

We note that the district court found that "plaintiffs have not demonstrated by a preponderance of the evidence, concerning any particular seed dispensed by defendant, both that it was a protected Deltapine variety and that defendant failed to label it as a protected variety after processing." *Delta and Pine Land Co.*, slip op. at 23. However, as can be seen from our discussion of the Nodena example, and from other findings of the district court (including a finding that Sinkers delinted 5.725 tons of "REGISTERED DES 119 cottonseed") the district court was simply finding that both requirements were not proved by Delta, and *not* that Delta failed to prove that Sinkers delinted any protected seed. *See id.* at 12. We, therefore, remand this issue for further proceedings consistent with the proper test of knowledge as stated above.

## CONCLUSION

We affirm the district court's holding of no infringement under the active inducement provision, 7 U.S.C. § 2541(8). We vacate the district court's holding of no

infringement under the unauthorized transfer of possession subsection of the PVPA, 7 U.S.C. § 2541(1) on the ground that it applied the wrong legal test in determining infringement. We vacate the district court's holding of no infringement under the notice (or labeling) subsection of the PVPA, 7 U.S.C. § 2541(6), because it is based upon an incorrect interpretation of the statute. We remand the transfer of possession and notice claims to the district court for further proceedings consistent with this opinion. There, further proceedings need not necessarily include additional evidence gathering by the district court, although we do not preclude that option. The district court may simply choose to reexamine its prior inferential fact-findings in light of the correct legal tests as set forth above. As can be seen from the Nodena example given above, the outcome may change based on application of the correct test, or it may not. If, however, additional evidence is needed, the district court should proceed accordingly.

The judgment, therefore, is

*AFFIRMED–IN–PART, VACATED–IN–PART AND REMANDED.*

## COSTS

Each party shall bear its own costs.

CLEVENGER, Circuit Judge, dissenting.

This case asks whether Sinkers is liable to Delta under three provisions of the Plant Variety Protection Act: transferring possession of protected seed without Delta's consent (section 2541(1)), failing to mark bags of protected seed with the required notice (section 2541(6)), and inducing infringing acts by others (section 2541(8)). The district court correctly held that Sinkers is not liable to Delta under these provisions. We should affirm the judgment of the district court.

In this case, Sinkers delinted several varieties of cottonseed obtained mainly from two sources: the Nodena cooperative (discussed by the majority) and Burgeen and Black Gin and Fertilizer Co. (a cotton gin). After delinting, the cottonseed was sold in transfers arranged by others, without any substantive participation by Sinkers. Sinkers argues that all of its delinting activity relates to seed being transferred from farmer to farmer under the protection of section 2543 of the Act, which shields farmer-to-farmer transfers from infringement under the sections with which Sinkers is charged. Because Sinkers was a mere passive participant in farmer-to-farmer transactions arranged by other persons (a finding that the majority accepts), it contends that it should escape liability under the Act, even though it is clear that it did effect transfer of possession of allegedly protected seed, a literal violation of the Act if the transferred seed is protected.

The majority concedes that a literal reading of section 2541(1) produces absurd results. If *any* transfer of possession of protected seed without consent violates the Act, then completely innocent parties who handle protected seed are swept under the Act. To avoid that result, the majority creates an exception to section 2541(1). Only the guilty party, that is, the one who knew or should have known that the seed is protected, is caught under section 2541(1). The innocent transferor escapes liability.

I agree that some limit must be placed on the transfer of possession statute to avoid absurd results. Even the Supreme Court has noted that this statute is virtually impossible to parse satisfactorily. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 185–86, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995)("It may be well to acknowledge at the outset that it is quite impossible to make complete sense of the provision at issue here."). Some 17 years ago, the

Fifth Circuit (which incidentally knows more about cotton growing, ginning and delinting than we) grappled with the Act and found another way of placing some sensible limits on the transfer and labeling provisions of the Act. In *Delta and Pine Land Co. v. Peoples Gin Co.*, 694 F.2d 1012 (5th Cir.1983), that court held that a party who is but a passive participant in a farmer-to-farmer transfer cannot be held liable under the Act.[1] In that case, the defendants were found to have arranged sales transactions among the farmers; not being merely passive, they were held liable under the Act. From 1983 until today, *Peoples Gin* has been the law of the Cotton Belt. Indeed, when this case was brought, the plaintiffs were under the impression that Sinkers had been actively participating in arranging the farmer-to-farmer transfers, and that this presumably would be an easy case for them to win under the law of *Peoples Gin*. As is so often the case, however, discovery proved the plaintiffs wrong: the evidence proves, as a matter of fact, that Sinkers has been a mere passive conduit in the farmer-to-farmer sales. For that reason, the district court simply applied the law of the Cotton Belt and relieved Sinkers from liability under the Act. The court quite reasonably noted that a delinter who is merely passively carrying out the instruction of its customers in delivering or releasing delinted seed is not substantively different from a delinter who merely returns the delinted seed to the person who asked it to be delinted. The court opined, and I agree, that a mere return of delinted seed to the sender should not violate the transfer of possession provision.

The majority prefers not to follow the lead of the Fifth Circuit. Instead, it holds that the transfer provision is only violated by knowing, or "should have known," farmer-to-farmer transfers of seed that are impermissible under *Asgrow*. I think it is a mistake to read a scienter requirement into the transfer of possession provision. It seems clear that Congress put the scienter element where it belongs, in section 2541(8), where to "instigate or actively induce performance of any of the foregoing acts" leads to liability. I prefer to follow the lead of the Fifth Circuit, which settled the law that has governed the market in all these intervening years.

Under the law as stated in *Peoples Gin*, ginners and delinters were saved the need to create a "paper trail" to protect completely passive conduct from liability under the Act. Under the rule devised by the majority in this case, ginners and delinters will become paper-keeping traffic cops. Ginners and delinters will have to keep up-to-date records on the membership of cotton cooperatives, including the acreage planted in cotton each season by each member of the cooperative. Under the

---

1. Peoples Gin actually was simply a farmer's co-op cotton gin that ginned farmers' cotton first, and then arranged for the sale of delinted seed that an owner farmer did not want for himself. The majority discounts the force of *Peoples Gin* on the ground that it involved a third party (*i.e.*, a nonfarmer) who arranged sales of farmer-owned delinted cottonseed. This hardly is a ground to discard the law as stated in *Peoples Gin*. Instead, it is the precise reason why the outcome in *Peoples Gin*—liability—would be incorrect in this case, where the "third party" is but a passive conduit in farmer-to-farmer transfers, which may or may not violate the statute.

The majority also wrongly rejects the law as stated in *Peoples Gin* as dictum. The rule that

active participation leads to liability (the rule of *Peoples Gin* ) however necessarily includes the rule that *no* active participation leads to *no* liability. An example suffices. In Case A, the trial court finds that fact × (say, active participation) is proven, and, based on that fact-finding, determines that the defendant has violated the act. In Case B under the same act, the plaintiff fails to prove fact × (*i.e.*, fails to prove active participation), so the defendant moves for judgment of no liability as a matter of law, citing Case A. Will the court in Case B reject the rationale of Case A as dictum? I think not.

Rather than struggle so to escape from *Peoples Gin*, I think the majority should respect and follow its rationale.

majority's rule, a forty member cooperative (forty farms of roughly a square mile each) will be a prima facie suspect of delivering excess seed to the ginner or delinter. Ginners and delinters will also have to keep current with any increase in acreage purchased by farmers during the course of a year, so they can satisfy themselves that a farmer is not delivering too much seed for ginning or delinting. Presumably ginners and delinters will want to ask those who deliver seed to them to provide them with certificates that say something like "the seed we are delivering is within the current section 2543 exemption." Those who deliver the seed to those who deliver it to ginners and delinters will also want some kind of certificate, to the same effect. The paper trail presumably will lead right back to the section 2543 farmer who is trying to save seed for his own use, or for sale as now permitted under section 2543. I can see mountains of paper piling up throughout the Cotton Belt. I can also see lots of work for lawyers trying and defending this kind of case. And many headaches for judges, who will have to decide if a case is lost, or won, when there are (as there inevitably will be) glitches here and there in the paper trial that, in a perfect, Federal Circuit world, will lead from farmer Joan on her south 40 to her neighbor with the truck who brings her seed to a coop, which gives the seed to a another to take it first to the ginner, then to the delinter and finally either back to Joan or to the person who buys her seed. Now all of this seems like a whole lot of trouble being visited on a settled law that went unchallenged for a very long time, and only got challenged in this case when the proofs under the settled law ran against the plaintiff.

The majority responds to my concern by guessing what goes into a cottonseed delinting contract, assuming farmer Joan signs such a contract, and then postulating that all a ginner or delinter needs to do to avoid liability is to stick a clause in the contract saying something like "you promise me that the amount of seed you are delivering does not exceed the amount you can lawfully save for replanting." That it will be so easy to satisfy the scienter requirement seems to me all the more reason why we should leave settled law alone.

The burden of establishing liability under the statute is of course on Delta. In addition to holding that liability cannot attach for mere passive conduct in transfers arranged by others, the trial court held that Delta had failed to prove that the delinted seed from the Burgeen and Black gin is "a protected variety belonging to plaintiff." *Delta and Pine Land Co. v. The Sinkers Corp.,* No. 93CV77–DJS, slip op. at 21 (E.D.Mo. Mar. 5, 1998). For failure of such proof, Sinkers cannot be held liable for transfers of that particular seed. I think the majority is trying to say the same thing in its footnote 8.

The majority opinion notes that Congress amended the Act in 1994. That amendment preserves the right of a farmer to save seed from the crop he produces from protected seed he has purchased. The farmer must either use such saved seed "in the production of a crop for use on the farm of the person," or sell such amount of the saved seed in a "bona fide sale for other than reproductive purposes."

This case, of course, arises under the statute before its amendment, and therefore neither the majority nor I can say with authority how the holding of the majority will apply to the future. We can predict, however, that a farmer who has purchased protected seed, and who wishes to use or sell the seed propagated by his plantings of protected seed—as the amended Act permits—will need the services of a delinter. It thus seems that, in order to avoid the absurd results that follow from an unrestrained reading of the Act, either a "passive" or a "knowing"

exception to the statute, or some other escape valve, is required.

I of course recognize that I, like the majority, read an exception into an otherwise broad statute. Whether either of us is correct in so doing is a matter for others to determine. Perhaps the Supreme Court will wish to grapple with the Act, again.

I respectfully dissent.