**DELTA AND PINE LAND COMPANY, Plaintiff,**

v.

**PEOPLES GIN COMPANY and Hollandale Seed & Delinting Company, Inc., Defendants.**

**No. GC 81–68–WK–O.**

United States District Court, N. D. Mississippi, Greenville Division.

March 3, 1982.

Donald E. Bourland, Memphis, Tenn., John L. Pearson, Rosedale, Miss., *for plaintiff.*

Nathan P. Adams, Jr., Greenville, Miss., for Peoples Gin.

L. Carl Hagwood, Frank W. Hunger, Greenville, Miss., for Hollandale Seed, etc.

## MEMORANDUM ORDER

KEADY, Chief Judge.

In this action for infringement under the Plant Variety Protection Act, 7 U.S.C. § 2321, et seq., plaintiff Delta and Pine Land Company, a cottonseed breeder, sues defendants Peoples Gin Company (Peoples), a Mississippi agricultural cooperative, and Hollandale Seed & Delinting Company, Inc. (Hollandale), seeking injunctive relief and damages for unlicensed sales and transfers of Deltapine 41 cottonseed, a novel variety

for which plaintiff holds a Certificate of Plant Variety Protection.[1] Plaintiff moves for summary judgment, basing its claim specifically on 7 U.S.C. § 2541 which provides in pertinent part:

> Except as otherwise provided in this subchapter, it shall be an infringement of the rights of the owner of a novel variety to perform without authority, any of the following acts . . .
>
> > (1) sell the novel variety, or offer it or expose it for sale, deliver it, ship it, consign it, exchange it, or solicit an offer to buy it, or any other transfer of title or possession of it;
> >
> > (6) dispense the novel variety to another, in a form which can be propagated, without notice as to being a protected variety under which it was received; or
>
> .        .        .        .        .
>
> > (8) instigate or actively induce performance of any of the foregoing acts.

Defendants were not a party to any agreement with plaintiff to sell Deltapine 41, and knew that it was a protected variety. Conceding that they delivered, shipped and transferred possession of the variety of seed to farmers, defendants assert that they are merely agents of the farmers who produced the seed, and hence their activity is within the "crop exemption" granted to farmers by 7 U.S.C. § 2543. This section provides in pertinent part that

> it shall not infringe any right hereunder for a person to save seed produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a crop for use on his farm, or for sale as provided in this section: *Provided,* . . . it shall not infringe any right hereunder for *a person, whose primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell such saved seed to other persons so en-*

*gaged, for reproductive purposes, provided such sale is in compliance with such State laws governing the sale of sale as may be applicable.* A bona fide sale for other than reproductive purposes, made in channels usual for such other purposes, of seed produced on a farm either from seed obtained by authority of the owner for seeding purposes or from seed produced by descent on such farm from seed obtained by authority of the owner for seeding purposes shall not constitute an infringement. *A purchaser who diverts seed from such channels to seeding purposes shall be deemed to have notice under section 2567 of this title that his actions constitute an infringement.* (Our emphasis)

Section 2543 allows a cotton farmer to sell his seed directly to another cotton farmer without infringement if such sale does not violate applicable state law. The section, however, makes no mention of the utilization of selling agents or the effect of their participation in sales to farmers for reproductive purposes. Consequently we must determine whether defendants are indeed agents of the farmers whose seed they transported and sold and, if so, whether their status as agents entitles them to protection under the farmer exemption.

The material facts, for purposes of the present motion, are not in dispute, the parties disagreeing only as to the effect of those facts upon the legal issues presented. An agricultural cooperative corporation organized and existing pursuant to Miss.Code Ann. § 79–17–1 et seq. (1972), Peoples primarily functions to gin cotton grown by its members and to handle their cottonseed and other agricultural products on a cooperative basis without profit. Section 79–17–25 provides that

> [s]uch incorporated association shall have the power to contract and be contracted with . . . to grow and market the agricultural products of its members, coopera-

---

**1.** This certificate recites that plaintiff is granted the right for a term of 17 years, from March 27, 1980, to exclude others from selling the variety, or offering it for sale, or reproducing or export-

ing it, or using it to produce a hybrid, to the extent provided by the Plant Variety Protection Act.

tively in pools and otherwise, and collect the same, *to purchase such products from its members;* to advance money upon such products to its members, or *to act as agent for its members,* to process, condition, pack, store, and otherwise safeguard, care for, and make ready for market the agricultural products of its members, purchase *for* and *sell to its members, seed* . . . . (Our emphasis)

Therefore Peoples is empowered to either purchase and resell seed for its members or simply act as the member's agent in arranging a sale.

There is no dispute as to the manner in which Peoples handles cotton ginning and the resulting seed at harvest. When a member's cotton is ginned, Peoples debits his account for the ginning costs, sells the cottonseed separated from his cotton to an oil mill and credits the sales proceeds to the member's account. On occasions, however, members instruct the gin to save certain seed for the next spring's planting. When this occurs, Peoples segregates the seed and transports it to Hollandale for delinting and treatment. The account of the member whose seed was saved is debited for the ginning charge, then credited for the seed's oil mill value. At planting time, the members who have arranged to get the seed either go to Hollandale's premises and pick it up or have delivery made to the farm. Peoples pays Hollandale's treatment and storage charges, and debits the accounts of members obtaining the seed. No funds pass directly from one member to another at any stage of the transaction.

The amount of seed saved annually is determined by the requests of its members; otherwise, Peoples sends the seed to the oil mill. These requests are brought to the gin's attention in one of several ways. The procedure often followed is that the producer asks Peoples to save a specified quantity, and he may retain all of it for his own planting, or he may direct the gin to hold a portion of the seed for another member desiring to purchase it. On other occasions a member may approach Peoples about obtaining a certain variety of seed, and the gin secures permission from the producing farmer to save his seed to meet the request. Frequently a member may orally instruct the gin to save his seed for whomever might want it, in which event the seed is held for one or more members who want the variety for planting.

In the fall of 1980, Peoples, following the stated procedures, saved a considerable amount of Deltapine 41 seed out of the member's cotton crops and transferred it to Hollandale for treatment and bagging. After processing, Hollandale labeled the bags as follows:

Peoples Gin of Winterville

DPL–41 80 Crop

Lot No. _____

Double treated

Machine delinted

Most of the seed produced by different farmers was segregated and kept in separate lots, but some was not and became commingled. Prior to spring planting, the seed was either delivered by Hollandale to the member farmers or picked up by them at Hollandale's warehouse. Some of the cooperative's members who obtained a quantity of seed were not the original producers.

■ Peoples had no written authority from its members but only their verbal permission to arrange the seed transactions. It asserts that its function was that of an agent for its members and not that of a buyer and seller of seed. We agree. Mississippi recognizes that an agency relationship can exist between a cooperative and its members. § 79–17–25; *Cole-McIntire-Norfleet Co. v. DuBard,* 99 So. 474, 475 (Miss. 1924). It is generally held that "unless it is clear that the parties to a cooperative marketing agreement intend an outright sale of the members' products to the association, the association is regarded as the agent of its members for the sale of their products." 18 Am.Jur.2d *Cooperative Association* § 26 at 284 (1965). It is certainly unclear whether Peoples and its members intended for each member's seed to be "sold" to the cooperative. In fact, the contrary intention is unmistakeably evident. Each member

retained control over the fate of his own seed and was entitled to retain all or a portion as he might desire and dispose of the remainder, either to the oil mill for crushing or to other members for reproduction. In event of the latter situation, Peoples never allowed one member to receive another's seed without first obtaining the producing member's permission. Thus, Peoples did not purport to act as if it owned the seed. Even though no payments for seed passed directly from one member to another, Peoples' debiting and crediting arrangement manifestly was maintained for the convenience of its members, and not for the cooperative's benefit, and hence it does not indicate a sale to or by the gin. *See* 16 Am.Jur.2d *Cooperative Association* § 26 at 285. Consequently, we hold that in handling the Deltapine 41 variety, Peoples was the agent of its members and did not buy seed from or sell seed to its members.

■ Although an agency relationship existed between Peoples and its members, this does not dispose of the issue of whether the seed transactions fall within the farmer exemption of § 2543. We hold that they do not. In construing a federal statute, courts must attempt to ascertain congressional intent and give effect to legislative will. *E.g., Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). Section 2581 proclaims that Congress' stated intention was to "provide the indicated protection for new varieties by exercise of any constitutional power needed for that end, so as to afford adequate encouragement for research, and for marketing when appropriate, to yield for the public the benefits of new varieties." Pub.L. 91–577, Title III, § 131, Dec. 24, 1970, 84 Stat. 1558. Despite their support of the measure, legislators expressed concern about the possibility of farmers experiencing increased seed costs and that these costs could in turn be passed on to the consumer. As a result of their concerns, during the course of enactment, the Plant Variety Protection Act was amended to include § 2543 exempting sales of seed by one farmer to another.

■ Grants of franchises which tend to exclude competition are to be strictly interpreted against the grantee and in favor of the public. *Piedmont Power & Light Co. v. Town of Graham,* 253 U.S. 193, 40 S.Ct. 453, 64 L.Ed. 855 (1920); 3 Sutherland, Statutory Construction, § 63.06 p. 90 (1973). Nevertheless, one claiming the benefits of an exception to the prohibition of a clearly delineated statute has the burden of establishing that he comes within its terms. *United States v. First City National Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151, 155 (1967). Neither will an exemption be implied except to prevent "absurd results" or consequences obviously contrary to the policy of the enactment as a whole. *See United States v. Rutherford,* 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68, 76 (1979). Section 2543 must therefore ·be construed in such manner as not to frustrate the declared purposes of the Plant Variety Protection Act. We note that other exemptions provided by §§ 2544 and 2545, which allow use of a protected variety by researchers and its transportation by conventional carriers, do not pose a threat to the seed breeder's protection. Neither does § 2543 allow serious encroachment upon this protection if its scope is limited to transactions where farmers sell their seed *directly* to other producing farmers without the assistance of a third ·party to arrange the sale. Absent active participation by a third party, a farmer's awareness of prospective farmer sellers and purchasers is necessarily limited by his own initiative and personal efforts, which serve to reduce the volume of sales that might qualify for exemption. Where a third party, such as a cooperative association, acts as agent, or broker, by bringing farmer buyers and sellers together, however, the volume of such sales is apt to increase according to the aggressiveness and size of the cooperative, often with no limitation upon its growth. To accord exempt status to extensive sales made on behalf of farmers by such entities would frustrate the basic purpose of providing protection to the breeder. Additionally, even though a cooperative organization ordinarily acts only as the mem-

bers' agent when cottonseed sales technically take place between members, transactions carried out by Peoples, in practical effect, are scarcely different, if at all, from consignments made to seed dealers which are clearly not exempt from the Act. To declare that farmer-to-farmer seed sales arranged by farmers' cooperative associations, or other like seed brokers, come within § 2543's exemption would cause the farmer's exception to swallow the rule mandating infringement and practically nullify the protection granted by the Act. We do not believe that Congress intended such a non sequitur. Therefore we hold that § 2543 exempts from the Act only those sales from one farmer to another accomplished without the intervention and assistance of independent agents to bring buyer and seller together.

■ Peoples clearly arranged sales in instances where a member authorized it to sell his seed to whomever wanted it or where a member first contacted the gin, and not the producing farmer, about the availability of seed. All sales brought about in this manner violated the act. Peoples' mere act of saving a producing member's seed for another at the producer's request did not violate the Act, however, since Peoples played no role in arranging sales of that nature.

■ Assuming, arguendo, that the seed sales arranged by Peoples were regarded as direct farmer-to-farmer transactions they nevertheless violated § 2541 since they were not made in compliance with applicable state laws governing the sale of seed. §§ 69–3–5 and 69–3–9 prohibit sales of seed without labels which provide specific information about weight of weed seeds, percentage of inert matter, germination, et cetera. This was not done. The only exemptions to Mississippi's strict labeling requirement are contained in § 69–3–11, which provides in pertinent part:

> Agricultural seed . . . shall be exempt from provisions of this article:
>
> (1) When *sold and delivered by a farmer-grower of this state on his own premises, but a farmer-grower is required to label* seed when sold and shipped away from his premises. . . . (Our emphasis)

This exemption does not apply to the transactions handled by the cooperative since the producing farmers did not sell and deliver the seed on their own premises. Because the transactions of unlabeled seed were illegal under Mississippi law, Peoples violated § 2541 of the Act.

■ Hollandale has likewise violated § 2541 by dispensing the illegally sold seed without notice to the purchasers that it was a protected variety. Many labels which it attached to seed bags did identify the contents as Deltapine 41 seed, but failed to indicate it was a protected variety. Hollandale independently violated the act by failing to conform with Mississippi labeling requirements. Section 69–3–11(3) exempts seed from the requirements

> [w]hen seed for processing is being *transported to, or consigned to, or stored in a processing or cleaning establishment,* provided that the invoice or labeling accompanying said seed bears the statement "seed for processing." (Our emphasis)

This exemption fails to protect Hollandale, however, since it applies to the transportation of seed *before* processing and during its storage by the processor. Because Hollandale transported improperly labeled seed after processing, it violated state law, and thus the federal act.

Finding that there is no dispute as to any material fact, we hold that plaintiff is entitled to partial summary judgment against Peoples and Hollandale as a matter of law on the issue of liability under the Plant Variety Protection Act. Resolution of remedies, including ascertainment of damages and appropriate declaratory or injunctive relief must await trial. Since the pertinent provisions of the Plant Variety Protection Act do not appear to have been elsewhere construed, and the case is one of first impression and involves a controlling question of federal law as to which there is substantial ground for difference of opinion, we conclude that an immediate appeal from this order may materially advance the ulti-

mate termination of this litigation. Therefore, we grant defendants leave of court to apply to the Court of Appeals for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and stay all further proceedings herein until resolution of any such appeal.

Accordingly, it is

ORDERED

1. That plaintiff Delta and Pine Land Company is hereby granted partial summary judgment as to defendants' liability under the Plant Variety Protection Act.

2. That defendants are hereby granted leave of court to apply to the United States Court of Appeals for the Fifth Circuit for an interlocutory appeal within ten days of this date pursuant to 28 U.S.C. § 1292(b).

3. That all further proceedings in this cause are stayed until resolution of any such appeal.