197 F.Supp.2d 1184 (2001)
DELTA AND PINE LAND COMPANY and Mississippi Agricultural and Forestry Experiment Station, Plaintiffs,
v.
THE SINKERS CORPORATION, Defendant.
No. 1:93-CV-77-DJS.
United States District Court, E.D. Missouri, Southeastern Division.
July 24, 2001.
*1185 Andrew N. Alexander, III, Stephen L. Thomas, Lake and Tindall, Greenville, MS, Robert B. Fuchs, Sikeston, MO, for Delta and Pine Land Co., Mississippi Agr. and Forestry Experiment Station.
Mark J. Pelts, Pelts and McMullan, Kennett, MO, for Sinkers Corp.

MEMORANDUM OPINION AND ORDER
STOHR, District Judge.
Plaintiffs are the holders of certificates of plant variety protection for certain varieties of cotton. They brought the instant action asserting that defendant, a delinter of cotton seed, had infringed plaintiffs' rights under the Plant Variety Protection Act ("PVPA"), 7 U.S.C. § 2321 et seq. After a non-jury trial, the Court entered judgment in defendant's favor. On appeal, the United States Court of Appeals for the Federal Circuit determined that this Court had not applied the appropriate legal standard in its analysis of two of the three alleged species of infringement. Delta and Pine Land Company v. The Sinkers Corporation, 177 F.3d 1343 (Fed.Cir.1999). The matter is before the Court on remand. The Court has previously concluded that reopening the record for additional evidence is not necessary or appropriate. See Order of Aug. 11, 1999 [Doc. # 63], p. 2. The parties have been permitted to submit updated proposed findings of fact and conclusions of law, however, and to respond to the opposition's filing via a written memorandum.
Having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, the Court here sets forth its findings of relevant fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

FINDINGS OF FACT
1. Plaintiff D & PL is engaged in the business of developing, breeding, and processing cotton planting seed for the production of agricultural crops.
2. D & PL is located in Scott, Mississippi, and regularly does business in states including Arkansas, Texas, Tennessee, Alabama, Mississippi and Missouri.
3. D & PL is the holder of numerous certificates of plant variety protection issued by the U.S. Plant Variety Protection Office of the U.S. Department of Agriculture, including certificates for the following varieties of cotton: Deltapine 20, Deltapine 26, Deltapine 30, Deltapine 41, Deltapine 50, Deltapine 51, Deltapine 55, Deltapine 62, Deltapine 69, Deltapine 70, Deltapine 77, Deltapine 80, Deltapine 120, Deltapine 5415, Deltapine NSL, Deltapine Acala 90, Terra C-30 and Terra C-40.
4. It is common usage in the industry to refer to seed of the Deltapine 20 variety as "DPL-20," to seed of the Deltapine 50 variety as "DPL-50," to seed of the Deltapine 51 variety as "DPL-51," and seed of the Deltapine 5415 variety as "DPL-5415."
5. Plaintiff MAFES is a unit of Mississippi State University which performs agricultural research and is also engaged in the business of developing, breeding and processing cotton planting seed for the production of agricultural crops.
6. MAFES holds a certificate of plant variety protection in a cottonseed variety known as DES 119.
7. MAFES has granted D & PL an exclusive license to market DES 119. D & PL produces DES 119 and markets it through its usual distribution channels.
*1186 8. D & PL employs a two-step distribution system in the sale and marketing of its seed, involving wholesale distributors and retail dealers. Only those under contract as Deltapine distributors have D & PL's authorization to sell or transfer D & PL's protected varieties of seed.
9. Missouri's "bootheel" is the state's principal cotton-growing region.
10. Cottonseed is prepared for planting by delinting to remove the fuzzy cotton fibers, and sometimes also by chemical treatment with fungicide and insecticide. Delinted seed is readily distinguishable from "fuzzy" cottonseed.
11. Defendant Sinkers, headquartered in Kennett, Missouri, is engaged in the business of delinting and conditioning cottonseed for future use as planting seed.
12. In processing, after being picked, cotton is taken first to a gin, where the fiber or lint is separated from the seed. The seed can then be taken to a delinter such as defendant.
13. Undelinted cottonseed arrives at Sinkers' Kennett facility via truck in bulk. In some cases, individual farmers bring cottonseed to the facility in pickup trucks. In many cases, large quantities of cottonseed arrive in tractor-trailer rigs. Upon its arrival at Sinkers' facility, undelinted cottonseed is placed in a "run bin." The seed is then fed into an auger, where it is wetted with a sulfuric acid solution. From there, the seed passes through a centrifuge where the solution is spun off. The seed emerges in a damp-dry condition and is passed through two dryers and two buffers. In the drying and buffing process, lint is separated from the seed. After culls, sticks and debris are removed from the seed, the seed is treated with chemicals (if so requested) and is placed in white 50-pound bags. After the seed has been bagged, it is loaded onto trucks and transported to its next destination.
14. Sinkers often conducts germination tests on representative samples of cottonseed received from its customers to determine the percentage of seed from a given lot which can be expected to germinate and produce a healthy plant. The test seeds are exposed to moisture and monitored for normal plant development. Germination rates are expressed in percentages, reflecting the number of seeds out of 100 which germinate properly.
15. Germination tests are often run prior to delinting; if the germination results are acceptable to the customer, the delinting takes place. After delinting, a second germination test is sometimes done to insure that the seed remains viable.
16. Sinkers' germination records sometimes include notations referring to the customer and to the variety of the seed.
17. D & PL develops new varieties of seed by pollinating one unique variety with another. The resultant cross-bred variety is then analyzed over a period of years to determine whether it has superior qualities. Such a variety, in contrast to a hybrid, is stable in that its progeny is similar to the parent plant; so long as no cross-pollination occurs, the variety can be continually replicated.
18. A new variety sought to be reproduced for sale is turned over to D & PL's foundation seed department, which increases the volume through repeated replanting while protecting the genetic purity of the variety, to reach saleable quantities of seed. Thereafter, D & PL hires farmers as contract growers who will return to D & PL the progeny of their crop.
19. In the period from 1988 to 1993, approximately 5-9% of D & PL's sales income was devoted to research and development. Prior to the enactment of the PVPA in 1970, D & PL made no significant *1187 investment in research and development because unique varieties of seed were not protected against use by competitors.
20. Most modern planting equipment is designed for seed which has been delinted so as to flow smoothly, without the friction of fuzzy seed. D & PL's market research indicates that virtually all commercial cotton farmers in the United States now plant delinted seed.
21. The term "brown bagging" seed refers to the practice of saving or selling protected seed for replanting, sometimes in violation of the PVPA.
22. Unlike "brown bagged" seed, the genetic purity and quality of seed originated by D & PL is meticulously maintained.
23. When brown bag sales of its protected varieties occur, D & PL receives no economic benefit in return for its investment in the development of the variety.
24. In December 1992, D & PL hired a Sikeston, Missouri private investigator named Gary Atchley, doing business as Investigations Unlimited, to conduct surveillance of defendant Sinkers' cottonseed delinting and processing business.
25. D & PL hired the investigator because it suspected defendant of violating plaintiffs' rights in protected seed varieties. D & PL had received a number of complaints from its district sales managers in the Missouri bootheel and northeastern Arkansas concerning large numbers of farmers planting brown bag Deltapine seed.
26. The surveillance of Sinkers began in January 1993 and ended in December 1993.
27. D & PL has never authorized Sinkers to transfer possession of D & PL's protected seed varieties or of MAFES' protected DES 119 variety.
28. Burgreen & Black Gin & Fertilizer is a proprietorship engaged in the business of cotton ginning in Madison, Alabama. In 1991, 1992 and 1993, Burgreen & Black delivered fuzzy cottonseed to Sinkers for delinting. Sinkers' internal germination records indicate that germination test results relating to this seed were entered under Burgreen & Black's name. During these years, Burgreen & Black gave seed away to various farmers who did their ginning with Burgreen & Black. When a farmer let Burgreen & Black know how much seed he wanted, Burgreen & Black would ship it to Sinkers and back for delinting, and have Sinkers bill the farmer directly for the delinting.
29. In 1992, Glenn Black of Black & Sons of Madison, Alabama obtained from Burgreen & Black 9.75 tons of cottonseed which was delinted by Sinkers. Sinkers billed Black & Sons directly for the costs of delinting the cottonseed obtained from Burgreen & Black. Plaintiffs have failed to prove by a preponderance of the evidence that this seed was of one of their protected varieties.
30. In February 1992, a Eudora, Arkansas cotton farmer named Jimmy Pylate purchased a quantity of cotton seed from Burgreen & Black in a transaction brokered by Sid Stephens. The seed was shipped from Burgreen & Black to Sinkers for delinting, and from Sinkers to Pylate. The quantity shipped from Sinkers to Pylate was 24.58 tons. Plaintiffs have failed to prove by a preponderance of the evidence that this seed was of one of their protected varieties.
31. Nodena Planting Company is a partnership of corporations and individuals which, until the spring of 1993, conducted cotton farming operations in the vicinity of Mississippi County, Arkansas.
32. Nodena was a customer of Sinkers, and had its cottonseed delinted by Sinkers from 1989 until 1993.
*1188 33. In calendar year 1990, Nodena sold 57.25 tons of cottonseed delinted by Sinkers to other farmers in Arkansas for planting purposes.
34. In calendar year 1991, Nodena sold 89.975 tons of cottonseed delinted by Sinkers to other farmers in Arkansas for planting purposes.
35. In calendar year 1992, Nodena sold 99.54 tons of cottonseed delinted by Sinkers to other farmers in Arkansas for planting purposes.
36. Concerning these Nodena seed sales in 1990, 1991 and 1992, plaintiffs have failed to prove to whom Sinkers transferred possession of the seed.
37. Concerning these Nodena seed sales in 1990, 1991 and 1992, plaintiffs have failed to prove that Sinkers had any knowledge concerning Nodena's sales of the seed.
38. In calendar year 1993, Nodena decided to lease its land to other farmers, and not to plant its own seed. In that year, Nodena sold all of the cottonseed it had delinted by Sinkers to other farmers in Arkansas for planting purposes. The quantity of cottonseed delinted for Nodena by Sinkers in 1993 amounted to 122.15 delinted tons.
39. At the time in the fall of 1992 when Nodena saved and delinted the seed from its 1992 crop, Nodena had not yet determined it would not itself plant cotton in 1993. That decision was reached in 1993.
40. In the period 1990 through 1992, Nodena planted approximately 3500 to 4500 acres in cotton each year, and approximately 85% of the cottonseed planted by Nodena was of Deltapine varieties, predominantly DPL-50. Plaintiffs have not proved that defendant had any knowledge of these facts.
41. For each of the planting seasons between 1989 and 1992, approximately half of the cottonseed planted by Nodena was saved seed, and half was purchased from local seed dealers. Plaintiffs have not proved that defendant had any knowledge of these facts.
42. Planting rates for cottonseed in the mid-South range from 10 to 20 pounds per acre.
43. If weather or other conditions damage a cotton crop after initial planting, a farmer may have to replant one or more times in the same growing season.
44. Delinted cottonseed may be saved more than one season and successfully used for replanting.
45. As indicated by Sinkers shipping records dated January 13, 1993, Sinkers shipped two loads of seed to Cromer Brothers Seed Company for storage, having delinted the seed after receiving it from Nodena Planting Company. Each load consisted of 880 fifty-pound bags of "Lot # 5" seed.
46. Various farmers and farms picked up and paid for quantities of the seed shipped to Cromer Brothers from Nodena via Sinkers.
47. Sinkers billed Nodena for the delinting of this seed on January 15, 1993.
48. After receiving a list of farmers and amounts from Nodena, Sinkers sent invoices to various farmers for their share of the delinting. These invoices were dated February 1, 1993.
49. Plaintiffs have failed to prove that, as of the date of its transfer of possession of the Nodena seed to Cromer Brothers on January 13, 1993, Sinkers had any knowledge of Nodena's intended sales of the seed to other farmers.
50. Sinkers was unaware of the details of Nodena's complex organizational structure, and so did not know the names of all the farmers and farming entities with a *1189 corporate or partnership interest in Nodena.
51. References in Sinkers' germination logs to Nodena cottonseed as "Lot 5" reflect Nodena's own designation of the seed in that manner to indicate Nodena's belief that the seed was DPL-50 variety, a belief not shared by Sinkers.
52. Defendant has had brokerage relationships with a Sid Stephens and a James Chiles under which Stephens and Chiles employed efforts to solicit delinting business for Sinkers and defendant paid them commissions on seed delinted at Sinkers.
53. As relevant to this action, defendant paid Sid Stephens $25 for every ton of cotton delinted by defendant, with the exception of one specified cotton variety. Stephens also sells chemicals and seed cleaning equipment, and has sold cottonseed doing business as Southeast Distributors. James Chiles, who operates a farm consulting firm in Mississippi, was paid $75 for every ton of cotton from Mississippi which was delinted by defendant.
54. Neither Stephens nor Chiles was proved to have acted as defendant's agent in brokering sales of cotton seeds between third parties.
55. Sinkers Invoice 1051, dated April 18, 1988, reflects that Sinkers, at the request of Sid Stephens, delinted 5.725 tons of "REGISTERED DES 119 cottonseed."
56. Sinkers' records reflect that Sinkers knew that Stephens had purchased this DES 119 cottonseed from Billups Plantation of Indianola, Mississippi, which was an increase grower of DES 119 for MAFES, the protected variety certificate holder.
57. After delinting, Sinkers transferred possession of the seed back to Sid Stephens.
58. Stephens then sold the seed to Holland Cotton Seed of Big Springs, Texas. It has not been proved that Sinkers had any knowledge of this intended sale at the time it transferred possession of the seed back to Sid Stephens.
59. Customers of Sinkers frequently describe seed by "Lot" number designations, many of which employ numbers familiar from the standard designations of protected D & PL varieties, such as "Lot 50," "Lot 51" and "Lot 5415," reminiscent of DPL-50, DPL-51 and DPL-5415. When instructed to do so by the customer, or as necessary to identify a customer's seed, defendant would employ Lot numbers of this type.
60. Neither Sinkers' germination records nor a customer's suggestive lot designation is sufficient to establish that particular seed was of a protected variety, or that Sinkers should have known the seed was of a protected variety. Prior to delinting, seed of one variety may be commingled with seed of other varieties at a number of points, including during picking, during storage, or during the ginning process, unless care is taken to employ a single-variety picker, separate storage and transportation, and a single-variety gin.

CONCLUSIONS OF LAW
Pursuant to 7 U.S.C. § 2541 as it read at the time of the alleged infringement, among the rights of the holder of a certificate of plant variety protection are the exclusive rights to:
(1) sell the novel variety, or offer it or expose it for sale, deliver it, ship it, consign it, exchange it, or solicit an offer to buy it, or any other transfer of title or possession of it; . . .
(6) dispense the novel variety to another, in a form which can be propagated, without notice as to being a protected variety under which it was received; or . . .
(8) instigate or actively induce performance of any of the foregoing acts.
Three potential species of infringement are at issue in this case. First, plaintiffs allege *1190 that defendant has infringed their rights under § 2541(1) by certain transfers of possession of protected varieties of cottonseed. Secondly, plaintiffs assert that defendant violated § 2541(6) by failing to mark bags of delinted seed to indicate that the seed was a protected variety. Finally, plaintiffs have contended that defendant instigated or actively induced violative transfers of protected seed, as prohibited by § 2541(8).

Transfer of Possession and Notice Infringement Legal Standards
Concerning the transfer of possession species of infringement prohibited in § 2541(1), the parties debate the interpretation and application of the "crop exemption" or "saved seed exemption" of § 2543 as a defense. In pertinent part, § 2543, as applicable to this case, provides:
Except to the extent that such action may constitute an infringement under subsections (3) and (4) of section 2541 of this title, it shall not infringe any right hereunder for a person to save seed produced by him from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a crop for use on his farm, or for sale as provided in this section: Provided, That without regard to the provisions of section 2541(3) of this title it shall not infringe any right hereunder for a person, whose primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell such saved seed to other persons so engaged, for reproductive purposes, provided such sale is in compliance with such State laws governing the sale of seed as may be applicable. A bona fide sale for other than reproductive purposes, made in channels usual for such other purposes, of seed produced on a farm either from seed obtained by authority of the owner for seeding purposes or from seed produced by descent on such farm from seed obtained by authority of the owner for seeding purposes shall not constitute an infringement. [Emphasis added.]
So-called "farmer-to-farmer" transfers of saved seed, authorized by the latter portion of highlighted text above, were allowed under the PVPA as applicable in this case, but are no longer so, the pertinent language having been deleted from the statute in 1994.[1]
Scant case law exists interpreting this provision, or the PVPA in general. The language of the saved seed exemption has also been found particularly difficult to construe and apply: "It may be well to acknowledge at the outset that it is quite impossible to make complete sense of the provision at issue here." Asgrow Seed Company v. Winterboer, 513 U.S. 179, 185-86, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995). In Delta and Pine Land Company v. Peoples Gin Company, 694 F.2d 1012, 1017 (5th Cir.1983), the Fifth Circuit affirmed the United States District Court for the Northern District of Mississippi, holding that "The crop exemption only contemplates direct sales between farmers without the active participation of a third party." Whether or not a particular transaction is exempt depends upon the particular role of the third party, such as a cooperative gin, in the arrangement of that transaction:
A sale is exempt if the seller instructs his cooperative to forward his seed to a particular named buyer. In that situation, the cooperative has not arranged the sale. Nor has it played an active *1191 role in the transaction. It has merely served as the vehicle for transfer of possession. A very different situation would develop if the cooperative is permitted to seek out potential buyers or sellers, or even to make it known that it holds seed for purchase by unidentified buyers. In those situations, the cooperative has actually arranged the sale. Therefore, the transaction falls outside the coverage of § 2543.
Id. at 1016-17. The Fifth Circuit deemed a "narrower reading of the exemption" to be "more in keeping with Congress' primary objective," namely maximizing the protection of new varieties so as to stimulate private plant breeding and development. Id. at 1015-16.[2] The delinter through which the transfers had been effected did not benefit from the saved seed exemption because it violated another PVPA provision by dispensing the protected variety without notice that it was protected, in violation of § 2541(6). Id. at 1017.
In 1995 in Winterboer, 513 U.S. at 191, 115 S.Ct. 788, the Supreme Court considered the scope of the saved seed exemption and held that "the only seed that can be sold under the proviso is seed that has been saved by the farmer to replant his own acreage." The Supreme Court has therefore read an intent requirement to exist, such that the exemption applies only where the farmer initially saved the seed for the purpose of replanting it himself, and later changed his plans. Id. at 191, 192, 115 S.Ct. 788. As plaintiffs' point out, this clarifying determination of the Supreme Court was made in 1995, several years after the conduct at issue here.
On appeal in this case, the Federal Circuit interpreted the transfer of possession provision of § 2541(1) as follows:
[T]he correct reading of subsection (1) requires that a delinter, ginner, or other third-party transferor facilitating a farmer-to-farmer sale know . . . or should reasonably know that its unauthorized transfer of possession is an infringing transaction, i.e., that the sale is not exempt under section 2543. Liability for infringement under subsection (1) thus turns on knowledge. If Sinkers knew, or should have known, that the transfer of possession was not within the farmer-to-farmer exemption, then it can be held liable for infringing subsection (1), but only then.
Delta and Pine, 177 F.3d at 1352.[3]
The second asserted type of infringement at issue is the dispensing of a *1192 protected variety of seed without a notice of its protected status, in violation of § 2541(6). The Federal Circuit interprets this provision to require notice of protected variety status where the dispensing party knows or should know, by any means, that the seed is a protected variety. Delta and Pine, 177 F.3d at 1355.

Proof of Protected Variety
Applying the Federal Circuit's standards, defendant can be liable for either of these types of infringement only if it knew, or should have known, that a particular batch of seed it received for delinting was of a protected variety. The Court has already found as to the seed received by defendant from Burgreen & Black Gin & Fertilizer and transferred after processing to Glenn Black and Jimmy Pylate that plaintiffs have not proved that the seed was of a protected variety. Memorandum Opinion of 3/5/98 [#49], p. 21. That finding stands, as nothing in the Federal Circuit's opinion affects it.
The Court's prior opinion made no express finding as to whether the several batches of Nodena seed addressed in the evidence were in fact of protected varieties. The Court suggested, however, that neither defendant's germination records nor a customer's inexplicit designation were sufficient to establish such a fact:
As finder of fact, the Court is not persuaded that defendant's germination records demonstrate the variety of particular seed. The records cannot be clearly matched with particular transactions by date and quantity, and sometimes fail to indicate a variety. Furthermore, the variety indication in such records would not be conclusively accurate, for the most part merely reflecting the "Lot number" designation given by the customer. This is in marked contrast to the plant biologist's determination of variety in the [Asgrow Seed Company v.] Winterboer [, 513 U.S. 179, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995)] case.
Memorandum Opinion of 3/5/98 [# 49], pp. 21-22. The factual determination whether defendant knew or should have known that particular seed was of a protected variety turns in this case on the information Sinkers received from the customer, and whether, for example, where a customer designated seed "Lot 5," Sinkers knew or should have known that the seed was DPL-50.
It is undisputed that the record contains no evidence of genetic testing to conclusively determine the variety of any cottonseed delinted by defendant. It is also undisputed that Sinkers' only source of knowledge concerning the variety of seed brought for delinting is what the customer tells the delinter. Richard Edgington is a co-owner and president of defendant Sinkers Corporation. He testified that the lot number reflected in any of defendant's records was merely a reiteration of the customer's designation concerning a particular batch of seed, and denied knowing that it signified that seed was of the Deltapine variety of the same number. When pressed, Edgington acknowledged that the correlation of lot numbers to Deltapine varieties was more than coincidental, but suggested that, whether veiled or explicit, a customer's indication of variety is no more than what the customer "thinks" he has sent to be delinted, rather than a positive determination of what the seed actually is. Edgington further acknowledged that farmers generally want to *1193 know what variety of seed they are planting, unless they are satisfied with mixed seed. Edgington's testimony contained competing suggestions about the reason for Sinkers' apparent change from express variety references in the late 1980's to the use in the early 1990's of lot number designations. At points, Edgington maintained that the change merely reflected a change in customers' instructions and usage, but elsewhere Edgington suggested the change might have been initiated by Sinkers upon advice of counsel.
Whatever a customer's motivation may have been for thinly disguising what he believed the variety of his seed to be, Edgington persuasively explained his own belief that seed received for delinting was no longer "pure seed" of any particular variety, after having likely been commingled with other seed or degraded in some manner in the preceding process of ginning:
I know that it's not pure seed. As you know, your dad ran a gin, many things can happen there. But anyway, that's what they wanted, what they told us it was. I said, what do you want on the bag? How do you want it designated? They'd probably say lot 50, lot 20, lot 5, lot whatever. That's what we put on the bag. I told Mrs. Pelts at that time, just put the lot number they request on the bag, don't put down on the invoice what they told you the seed was. We know it can't be pure seed. That's what they believe it to be....
Trial Transcript [Doc. # 55], Vol II, p. 27, l. 16-25. The testimony of D & PL's own divisional president William Arnold supports Edgington's thinking:
So a farmer who gets brown bagged seed that's identified as one of our varieties may encounter problems with that variety. The germination may not be up to standards; the purity may not be up to standards. There could be a number of things that happen to that variety while it's being handled or stored that would tend to degrade either the genetic purity or the physical quality of the seed.
Id. at Vol. I, p. 52, l. 11-18. Plaintiffs have subsequently attempted to clarify or correct Arnold's statement here concerning "genetic purity" to refer to commingling of seed with other varieties, which is also the Court's interpretation of Mr. Edgington's reference to seed no longer being "pure." Pltf. Responses to Def. Supp. Proposed Findings of Fact and Conclusions of Law [Doc. # 68], p. 6.
As a practical matter, Sinkers' interest in the customer designations appears to have been for purposes of labeling bags of delinted seed. The information at issue was only imparted to Sinkers by the customer, if at all, for that purpose. Edgington's reticence to label as Deltapine 50 seed which he believed was no longer purely or reliably Deltapine 50 is reasonable and prudent, and may represent a good faith endeavor to avoid violating the law by false or erroneous labeling. That legal issue is not before the Court, although it appears that the parties have contrary positions on it. The Court mentions it only to explain that the reasonable rationale explained in Edgington's testimony lends weight to the credibility of his testimony that he did not believe customer's statements about variety could be taken to be accurate. These conclusions are not at odds with the notion that delinting customers are interested in some indication of the variety of seed for planting purposes, even if they too understand that "brown-bag" seed is likely to be of commingled varieties.
The Federal Circuit's opinion several times repeats this Court's intentionally carefully-worded finding that references in Sinker's germination logs to "Lot 5" seed *1194 reflected customer Nodena's practice of designating seed in that manner to indicate that the seed was DPL-50 seed. The Federal Circuit further suggests that the notice element they read into the statute is satisfied if Sinkers knew the term was Nodena's way of designating the seed as DPL-50. For the reasons previously stated, consideration of the entire factual record suggests instead that plaintiffs fail to show that, without more, defendant's customer's conclusory suggestions concerning variety are sufficient to support a finding that defendant "should have known" that the customer's seed was in fact a protected variety. By contrast, if a delinter is shown to have actually had additional information concerning the origins and handling of the seed prior to its arrival for delintingsuch as that it was picked by a one-variety picker, carefully stored separately from other seed, and ginned at a single-variety ginsuch evidence might support a finding that the delinter knew or should have known the seed was of a protected variety. No such evidence is presented here, however, where plaintiffs contend that the customer's generic but suggestive designation is enough.
In addition to the scienter element of § 2541(1) or (6) infringement as construed by the Federal Circuit, it should not be forgotten that a distinct and clearly threshold element of plaintiffs' proof is that particular seed was in fact of a protected variety belonging to plaintiffs. In other words, plaintiffs cannot recover for infringement concerning seed that was not of their protected variety. For the same reasons as the Court is not persuaded defendant should have known the seed in most of the challenged transfers was protected, the Court also concludes that plaintiffs have failed to present sufficient evidence to support a finding that the seed was a protected variety. Plaintiffs' own representative admitted not knowing whether the seed involved in any particular challenged transfer was in fact plaintiffs' seed or was commingled seed. Trial Transcript [Doc. # 55], Vol. I, p. 151, 1.25p.153, 1.12.[4] Plaintiffs' failure to carry their burden of proof as to protected variety and as to defendant's knowledge of protected variety defeats plaintiffs' claims of infringement by transfer of possession [§ 2541(1)] and by failure to label [§ 2541(6)] as to all but one seed transaction.

Sid Stephens and the DES 119 Seed
In one instance, the evidence proved and defendant in fact did not dispute that protected seed was involved. In April 1988, defendant delinted 5.725 tons of DES 119 cottonseed. Plaintiff MAFES holds the certificate of plant variety protection for DES 119, and has granted plaintiff D & PL an exclusive license for its sale and distribution. The Court concludes that plaintiffs have failed to prove that defendant knew or should have known its transfer of possession of this seed violated any rights under the PVPA. The evidence indicates that Sinkers took possession of the seed from Sid Stephens and returned possession of the seed to Sid Stephens.[5] *1195 There exist documents which support a finding that Sinkers knew that Billups Farms of Indianola, Mississippi was the producer of the seed and that Sid Stephens' company, Southeast Distributors, had purchased the seed from Billups Farm. Edgington testified as to his apparently accurate belief that Billups Farms was an increase grower of DES-119 seed for Mississippi State, the certificate holder, and further as to his belief, based on that understanding, that the registered seed tags and Mississippi Seed Improvement Association Shipping and Receiving Report which accompanied the seed evidenced that the sale by Billups to Stephens was proper. The evidence does not show that Sinkers had any knowledge of Stephens' intentions for the seed's further sale to Holland Cotton Seed.
Because Sinkers' transfer of possession of the seed was back to Stephens, and not to Holland Cotton, the analysis required by the Federal Circuit's opinion appears to be of whether Sinkers knew or should have known that Stephens' acquisition or possession of the seed violated the PVPA.[6] Plaintiffs' uncontradicted evidence that MAFES has granted D & PL an exclusive license to market DES 119 suggests the conclusion that Billups' sale of the registered seed to Stephens violated plaintiffs' PVPA rights. Knowledge sufficient to support that conclusion cannot, however, be imputed to Sinkers on the evidence of record. The evidence demonstrates that Sinkers knew of Billups' relationship with MAFES, and based on that knowledge believed that Billups' sale of the seed was authorized by MAFES. It has not been shown that Sinkers knew or should have known that Billups' relationship with MAFES did not permit the sale to Stephens. On this rationale, the Court concludes that plaintiffs have not met their burden of proof to establish a violation by Sinkers with respect to the April 1988 transfer of possession of DES 119 cottonseed back to Sid Stephens.
As for any § 2541(6) infringement for dispensing this seed without notice as to being a protected variety, the Court previously found and here reiterates that "[t]he evidence . . . does not establish the nature or contents of any labels on the seed before or after processing by defendant." Memorandum Opinion of 3/5/98 [# 49], p. 23 (emphasis added). If anything, the evidence suggests that the seed was dispensed bearing the purple "Registered Seed" tags some of which are in evidence in the case, and those tags contain the variety designation DES 119. Plaintiffs have therefore failed to prove that the required notice was not on the seed when it was "dispensed" by Sinkers, and no liability is established.

Nodena Planting Company Seed: Alternative Bases for Determination in Defendant's Favor

Any liability concerning the seed Nodena Planting Company sold to various farmers is precluded by the Court's determination that plaintiffs have failed to prove that the seed was of their protected varieties or that Sinkers knew or should have known the seed was of plaintiffs' protected varieties. In addition, any liability based on the Nodena seed delinted by Sinkers in 1990, 1991 and 1992 is precluded by lack of proof concerning the party to whom defendant transferred possession of such seed and/or plaintiffs' failure to show that Sinkers knew or should have known that a transfer by Nodena to the party to whom Sinkers transferred possession of the seed was in violation of the PVPA. Sinkers cannot be held liable merely because plaintiffs establish *1196 that Nodena made numerous sales of saved seed which violated the PVPA. The potentially PVPA-violating conduct on Sinkers' part is the transfer of possession. In order to recover, plaintiffs must establish to whom Sinkers transferred possession of particular seed, and also that Sinkers knew or should have known that that party's receipt or possession of the seed violated the PVPA. If Sinkers transferred possession of protected seed back to the farmer who produced it, with no reason to believe the farmer could not have lawfully saved the seed under the PVPA, Sinkers cannot be held liable for a PVPA violation merely for billing another farmer for the delinting, even if Sinkers should have known that a sale by the first farmer to the second would violate the PVPA. In such a scenario, Sinkers is not involved in the violative transfer of possession.
Based on more specific proof than that adduced for earlier years, plaintiffs seek damages based on 122.15 tons of Nodena seed delinted at Sinkers in 1993, which Nodena later sold to a number of other farmers. After delinting, this seed was taken to storage at a facility called Cromer Brothers. The farmers purchasing the seed from Nodena received possession of it from Cromer Brothers, not from Sinkers; Sinkers transferred possession of the seed to Cromer Brothers, not to the purchasing farmers.[7] Furthermore, Sinkers' original January 15, 1993 invoice billed Nodena for all the delinting of this seed. Later, based on information provided by Nodena, Sinkers billed the purchasing farmers for a proportionate share of the delinting costs. Defendant's representative testified that he was unfamiliar with the details of Nodena's complex structure and that he believed that these farmers were various Nodena farmers who had produced the seed. In any event, the dates of the original January 15, 1993 invoice and the February 1, 1993 substitute invoices suggest that as of Sinkers' transfer of possession of the seed to storage at Cromer Brothers on January 13, 1993, Sinkers was unaware of any intended sale of the seed by Nodena.
That being the case, the Court analyzes Sinkers' knowledge concerning whether Nodena's own retention of the seed was permissible under the PVPA.[8] This determination depends on what Sinkers knew about Nodena's acreage. Defendant's president, Mr. Edgington, was asked what Nodena Planting Company is, and his response referred to its control of a large acreage in the neighborhood of 5,000 acres as "testified to." The record does not establish anything about Sinkers' knowledge at any time prior to the litigation of Nodena's acreage from year to year. Even assuming that Sinkers believed, at the relevant time period, that Nodena planted up to 5,000 acres of cotton, it cannot be said that Sinkers knew or should have known that Nodena could not permissibly save 122.15 tons of cottonseed from 1992 to 1993, when all the possible variables are taken into account.
As previously explained, the saved seed exemption permits a farmer to save seed to replant his own acreage. D & PL's representative testified that planting rates in the mid-South range from 10 to 17 pounds an acre, and that at 15 pounds per acre, this amount of seed would plant 15,000 to 16,000 acres. Sinkers' representative testified that planting rates vary from 12 to 20 pounds per acre. Using the high *1197 end of that range, the Nodena seed could plant up to 12,215 acres.[9] Under either computation, saving that much seed is not out of the question if, as there was unrebutted testimony to, (1) a farmer may reasonably contemplate having to replant several times after his initial planting, if weather or other conditions injure the crop, and (2) saved seed can be used in subsequent planting seasons as well. The Court's conclusion is further bolstered if Sinkers cannot be held responsible for applying Winterboer principles to the issue several years before the Supreme Court's decision in that case. For all the foregoing reasons, then, no liability is proved to attach based on the 122.15 tons of seed delinted by Nodena in 1993, or the various amounts of seed delinted by Nodena in 1990, 1991 and 1992.

Active Inducement Infringement
Concerning the active inducement variety of infringement, the Federal Circuit has affirmed this Court's previous determination that plaintiffs failed to prove that defendant brokered or actively arranged any sales that led to the transfers of possession which plaintiffs challenge. On that issue, then, defendant is entitled to judgment on the same basis as before.

In Conclusion
For all the foregoing reasons, the Court concludes that defendant is entitled to judgment on all claims tried in this case. The Court is not unmindful of or unsympathetic to the interests of plant variety protection certificate holders such as plaintiffs, and the losses they may suffer from widespread transfers of protected varieties of seed in violation of the PVPA. In this case, however, as a result of a broadbrush approach, plaintiffs have at times failed to prove facts which they think they have proved, and have at times failed to prove facts the necessity of which they overlook. Although it appears that PVPA violations may be more readily proved against a number of farmers and other cotton industry actors directly responsible for infringing conduct, plaintiffs seek liability against the delinter as a more convenient single target, and notably one who is not itself a seed-purchasing potential customer. Although there is nothing inherently wrong with this self-interested strategy, it carries difficulties in both law and fact which defeat plaintiffs' claims here.
Accordingly,
IT IS HEREBY ORDERED that the Court's memorandum opinion and judgment of March 5, 1998 are vacated and replaced by this memorandum opinion and order and the judgment separately entered herein this day.
NOTES
[1] The amendments apply only to certificates of plant variety protection issued after April 4, 1995, that were not pending on or before that date. Pub.L. 103-349, §§ 14(a), 15; 108 Stat. 3144, 3145.
[2] See also Delta and Pine Land Company v. Peoples Gin Company, 546 F.Supp. 939, 943 (N.D.Miss.1982):

Absent active participation by a third party, a farmer's awareness of prospective farmer sellers and purchasers is necessarily limited by his own initiative and personal efforts, which serve to reduce the volume of sales that might qualify for exemption. Where a third party, such as a cooperative association, acts as agent, or broker, by bringing farmer buyers and sellers together, however, the volume of such sales is apt to increase according to the aggressiveness and size of the cooperative, often with no limitation on its growth. To accord exempt status to extensive sales made on behalf of farmers by such entities would frustrate the basic purpose of providing protection to the breeder.
[3] This Court had rejected a scienter standard for liability, reasoning that such a construction:

would impose on third-party gins and delinters the role of Plant Variety Protection police, requiring them to attempt to determine whether any transfer of seed effected in connection with the delinting process was exempt under the statute, as it then existed, including whether the parties to the transaction were primarily engaged in the growing of crops for sale for other than reproductive purposes, whether the transaction was in any way brokered or arranged by a third-party, and whether the transferor initially saved the seed with the purpose of replanting it himself.
Memorandum Opinion of 3/5/98 [# 49], pp. 20-21. Circuit Judge Clevenger in dissent agreed: "Under the rule devised by the majority in this case, ginners and delinters will become paper-keeping traffic cops." Delta and Pine, 177 F.3d at 1358.
[4] Plaintiffs have offered evidence of estimates of the percentage of Deltapine seed planted by a particular Sinkers' customer or in a particular geographic area. The Court is far from persuaded that such evidence is sufficient to support a finding that particular seed arriving at Sinkers was of a particular variety. Even if it were sufficient, however, the evidence does not establish that Sinkers had knowledge of such percentage estimates.
[5] The parties both appear to have assumed that Sinkers transferred possession to Holland Cotton Seed in Texas, to whom Stephens ultimately sold the seed, but the evidence showed instead that Stephens picked up the seed after delinting. This is one of several instances in which plaintiffs have been less than careful about their proof and legal analysis concerning their transfer of possession claims.
[6] See Delta and Pine, 177 F.3d at 1353. Plaintiffs' focus on the sale to Holland Cotton Seed (see n. 4 supra) has diverted the focus of their analysis.
[7] Plaintiffs again overlook the facts and analytical significance of this particular transfer of possession.
[8] The Federal Circuit's preliminary consideration of the analysis concerning this 1993 Nodena seed also focused on this question, rather than on Sinkers' knowledge about the fact of, or permissibility of, any transfers of the seed from Nodena to other farmers. Delta and Pine, 177 F.3d at 1352-53.
[9] Without explanation, the Federal Circuit states that this seed is enough to plant "close to 25,000 acres." Delta and Pine, 177 F.3d at 1352, n. 7. This computation is not supported by the planting rates testified to by the parties here.